# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1584

ANDREW J. ARLOTTA,

*Plaintiff-Appellant*,

v.

BRADLEY CENTER and the CITY OF MILWAUKEE,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-407—**J.P. Stadtmueller**, *Judge.*

_____

ARGUED SEPTEMBER 3, 2003—NOVEMBER 18, 2003

_____

Before POSNER, KANNE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Selling something, or at least trying to sell something, for more than you paid for it is as American as apple pie. Yet in some instances, and this case concerns one of them, adhering to that seemingly simple proposition can get one in hot water. Our case today is about "ticket scalping," a practice we will discuss in broad terms before turning to the specifics of the case, which involves an appeal from a grant of summary judgment dismissing a § 1983 civil suit brought by Andrew Arlotta following his arrest for allegedly violating Milwaukee's "ticket scalping" ordinance.

Ticket scalping is generally understood to be the reselling of tickets to popular entertainment or sporting events at "greatly above the stated rates." *Webster's Third New International Dictionary of the English Language Unabridged* 2024 (P. Gove ed. 1976). When one thinks of "scalpers," we naturally think of someone selling tickets to sporting events, the theater, or a concert, but they have also been known, for example, to sell tickets to the White House tour, even though those tickets are otherwise free. Ellen Gamerman, "Rangers are Cracking Down on White House Ticket Scalping," *The Buffalo News*, Sept. 14, 1997.

Just as the product being sold is diverse, so are the scalpers themselves. The popular caricature of a scalper is someone outside a ballpark who asks if you "need two." This is only a small percentage of the sellers who profit off the resale of tickets, however. In 1999, New York Attorney General Eliot Spitzer published a report on ticket selling practices, "Why Can't I Get Tickets? Report on Ticket Distribution Practices," May 27, 1999. Attorney General Spitzer's report concluded that "Street scalpers are . . . the smallest part of the immense ticket resale industry." *Id. See also*, Editorial, "Broadway Robbery," *New York Times*, March 25, 1995 ("Scalping is no longer merely the province of individuals who . . . sell [tickets] for a huge profit on the sidewalk" but also of "[t]icket wholesalers [who] buy up huge blocks of tickets and resell them . . . .").[1]

Once a scalper gets ahold of a batch of tickets, he offers to resell them at prices that are substantially, and sometimes exorbitantly, higher than their face value. Since those wishing to attend an event are no longer able to obtain tickets from the original source, they are compelled to

---

[1] New York state law is interesting in that it permits ticket scalping as long as the scalper's selling price doesn't exceed either $5 or 10 percent of the face value of the ticket.

either pay the scalper his price or forego attendance. The event's popularity is the only ceiling on the price a scalper can charge.

In one sense, this is the perfect "free" market—supply and demand leads to the optimal price for a commodity. It could be argued that no one has a "right" to attend a sporting event or concert, and those who can't afford to attend, or choose not to pay a scalper's price to buy a ticket, should not be heard to complain. Neither the original seller nor the final buyer, moreover, is harmed. As the California Supreme Court explained in invalidating an anti-scalping law almost 100 years ago:

> The sale of a theater ticket at an advance upon the original purchase price, or the business of reselling such tickets at a profit, is no more immoral, or injurious to public welfare or convenience, than is the sale of any ordinary article of merchandise at a profit. It does not injure the proprietor of the theater; he must necessarily have parted with the ticket at his own price and upon his own terms before such resale can be made. It does not injure the second buyer; he must have had the same opportunity as the first buyer to purchase a similar ticket, and no greater right thereto, and having neglected that opportunity, or being unwilling to undergo the necessary inconvenience, and willing to pay a higher price than forego the privilege which the other by his greater diligence and effort had obtained, the transaction is just so far as he is concerned.

*Ex parte Quarg*, 149 Cal. 79, 84 P. 766, 767 (1906).

We have expressed a similar notion:

> Ticket scalpers, like arbitrageurs in stock markets and dealers in gems, move assets in scarce supply toward those willing to pay the most for them. If promoters of an opera or rock concert underestimate the demand for

the tickets and set prices too low, the initial buyers make a profit, while scalpers receive compensation for the service of moving the tickets from those who first acquire them to those who value them more highly. Promoters lose nothing from scalping in such cases, and everyone else may gain.

*United States v. Mount*, 966 F.2d 262, 263 (7th Cir. 1992).

There is an opposing view, however. Scalpers are viewed not as operators in a perfect free market, but rather as manipulators of that market. As one author wrote:

The scalper manipulates price. Through the tactic of removing a supply of tickets from the original intended marketplace, the scalper has deprived consumers of the ability to purchase at the established market price. Having eliminated the original market, the scalper is now freed of previously existing restraints and has empowered himself to set new, substantially higher, prices.

Thomas A. Diamond, "Ticket Scalping: A New Look At An Old Problem," 37 U. Miami L. Rev. 71, 79 (1982). If this view is accepted, entertainers and regulators have an interest in enforcing anti-scalping laws, not to distort the market, but to protect it. In this way, anti-scalping laws are more akin to laws proscribing unfair trade practices. *Id.* at 80-81.

Whatever one's view on where scalping fits in the economy—as legitimate participant or illegitimate manipulator—there is a reason why local governments often wish to enforce laws curtailing *where* the practice can take place—they perceive that the presence of scalpers surrounding the site of an event is an annoyance and can be, in some instances, even dangerous. Scalpers obviously need to approach potential customers. This adds to the congestion around a stadium or arena. As a California court recognized, "Persons with tickets for sale may be expected to

intrude themselves along the most heavily traveled pathways, audibly or visually demanding the attention of the tens of thousands who approach the [stadium] within a short period of time." *People v. Shepherd*, 141 Cal. Rptr. 379 (1977), *cert. denied*, 436 U.S. 917 (1978).

With that background, we return to the instant appeal. In February 2001, the Milwaukee Bucks were in the middle of a season that would end one missed basket—by Glenn "Big Dog" Robinson—away from a trip to the NBA finals. After several years of mediocrity, the team had two all-stars (Robinson and Ray Allen) and was in first place in its division. A local newspaper headline, over a story by Dale Hoffman, a respected sports columnist not known for hyping the home team, epitomized the atmosphere of excitement that existed in Milwaukee: "Hot Bucks Making Sweet Music." See *Milwaukee Journal Sentinel*, Jan. 24, 2001.

Not surprisingly, with the team winning, more fans wanted to attend games. For the first time in years, the Bradley Center, the arena where the Milwaukee Bucks play, was regularly filled to capacity. And a full arena meant that ticket scalpers would be out to make a buck off the Bucks. This caused the Bradley Center to become increasingly concerned with scalpers who were, in its judgment, harassing customers. At first, the Bradley Center attempted to deal with the scalpers itself. The problem, however, was difficult to effectively combat. Some scalpers, for example, threatened to physically harm security personnel who interfered with their business. In fact, the Bradley Center had a hard time even finding security personnel willing to work outside its doors. As the number of scalpers increased, the Bradley Center sought help from the Milwaukee Police Department (MPD), who it hoped would breath some life into an anti-scalping ordinance that sat, rarely used, on the books of the city of Milwaukee. The ordinance, with exceptions not applicable here, prohibits

any person from selling tickets within 500 feet of the Bradley Center starting two hours before and ending one hour after a scheduled event.

In January 2001, the MPD developed a plan to deal with Bradley Center ticket scalpers. The plan was to arrest and detain all those selling tickets close to the Bradley Center. Those arrested would be read a notice, developed by the Bradley Center, that advised them that they were no longer welcome at the arena; if they returned they would be arrested again, this time for trespassing. The MPD informed the Bradley Center of its plan, which called for using plainclothes and uniformed police officers. A plainclothes officer would mingle in the crowd, and if he observed ticket sales close to the Bradley Center he would call a uniformed officer. The uniformed officers would respond to the call and arrest the would-be seller identified by the plainclothes officer.

On the night of February 13, 2001, the MPD implemented its plan. That night, Arlotta arrived at the Bradley Center about an hour before a big Bucks game against the Philadelphia 76ers. He had two tickets to the game, and he says he was waiting for his father, who was driving from Illinois to join him. Soon after he arrived, he says that several police officers surrounded him. He was accused of trying to sell tickets (a charge he denied), handcuffed, searched, and arrested. His two game tickets were confiscated.

Not surprisingly, the police tell a different tale. Officer Richard Chin, who was in plainclothes that night, testified that Arlotta approached him and offered to sell him tickets. After Chin said no, he saw Arlotta walk up to others and ask if they needed tickets. At this point, Chin called the uniformed officers and directed them to arrest Arlotta. The arrest was made within two minutes.

Although the parties dispute whether Arlotta tried to sell tickets, everyone agrees on what happened after Arlotta was arrested. The police held him in a police van for about an hour, and a representative of the Bradley Center entered the van and read a "Notice of Violation" form. Arlotta repeated that he was not trying to sell tickets but was merely waiting for his dad (who, by the way, had apparently arrived) before going into the Bradley Center for the game. Later, the police drove Arlotta and others arrested for selling (or trying to sell) tickets to police headquarters, just a few blocks away, for booking. Arlotta was released, after about 4 hours in custody, and given two citations alleging municipal ordinance violations.

Four days later, Arlotta and his father had a meeting with John Steinmiller, the vice-president of business operations for the Milwaukee Bucks, and Steven Costello, the assistant manager of the Bradley Center. Steinmiller and Costello apologized and said they were sorry Arlotta was arrested. They said they would request that the police dismiss the charges against Arlotta, and both citations were eventually dismissed.

At this point, it is important to emphasize what this case is not about. It is not about the wisdom of an ordinance that prohibits all ticket-selling outside an event's venue. While we think it very well may be both unfair and unwise to prohibit a person from selling an unneeded ticket for a game at face value or below, the ordinance here does not make that distinction. Plus, as Attorney General Spitzer's report which we have quoted makes clear, "street scalpers" are but a small part of the ticket resale industry. Indeed, as one author has wisely noted, it is ironic that laws against ticket scalping "coexist mysteriously" with laws permitting ticket brokers to buy tickets in bulk and then sell them at scalper prices. *See* Richard A. Posner, "Rational Choice, Behavioral Economics, and the Law," 50 Stan. L. Rev. 1551, 1573 (1998).

Arlotta, who denies that he was reselling, or scalping, tickets, however that term may be legally defined or commonly understood, sued the City of Milwaukee and the Bradley Center (but not the arresting officers individually) under 42 U.S.C. § 1983, alleging false arrest, illegal confinement, and malicious prosecution. The City of Milwaukee and the Bradley Center moved for summary judgment. As we said, that motion was granted.

To state a § 1983 claim against a municipality, a complaint must allege that a constitutional deprivation was caused by an official policy or custom. In *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978), the Court emphasized that "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Significantly, a plaintiff must show a "direct causal link between the municipal policy and the constitutional deprivation." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993). The policy or custom must be the "moving force" behind the alleged constitutional deprivation. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). The Supreme Court has warned:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal

    connection between the "policy" and the constitutional deprivation.

*Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

    Here, Arlotta does not allege that the City of Milwaukee scalping ordinance is unconstitutional.[2] Instead, he argues

---

[2] Without deciding the issue, it seems unlikely he could be successful on such a claim. In 1927, the Supreme Court, in *Tyson & Brother v. Banton*, 273 U.S. 418 (1927), ruled unconstitutional an ordinance that prohibited the resale of any ticket to a theater or place of amusement or entertainment at a price in excess of 50 cents beyond the price printed on the face of the ticket. The city enacted the ordinance to protect consumers from the extortionate prices demanded by ticket brokers who, having purchased the available box office supply of tickets, had a virtual monopoly on tickets to theater events. The Court determined that the ordinance was unconstitutional because it was a governmental attempt to regulate prices. *Id.* at 440. The Court stated that, absent an emergency, price regulation was permissible only when the business to be regulated was "affected with a public interest." *Id.* at 430 (quoting *Munn v. Illinois*, 98 U.S. 113, 126 (1876)). The entertainment industry did not satisfy this criterion. *Id.* at 434.

    *Tyson* was short-lived. In 1934, the Supreme Court, in *Nebbia v. New York*, upheld a state statute fixing the minimum and maximum retail prices of milk. 291 U.S. 502, 536 (1934). The Court repudiated the "public interest" test. *Id.* at 536. In *Olson v. Nebraska ex rel. Western Reference & Bond Ass'n*, 313 U.S. 236 (1941), the Court, in upholding a state's regulation of fees that an employment agency could charge, again rejected the *Tyson* rationale. *Id.* at 245.

    In *Gold v. DiCarlo*, 235 F. Supp. 817 (S.D.N.Y. 1964), *aff'd per curiam*, 380 U.S. 520 (1965), the Supreme Court affirmed *per curiam* a district court ruling that upheld the constitutionality of anti-scalping legislation. As the district court stated, "[W]e would be abdicating our judicial responsibility if we waited for the Supreme Court to use the express words, 'We hereby overrule

(continued...)

that his unlawful arrest was caused by the MPD's plan to deal with ticket scalping. Specifically, he argues that the plan was not properly structured to prevent mistaken arrests—it was predictable that the police would make mistakes when arresting persons in large crowds.

We disagree. The plan, of course, did not call for the police to randomly sweep the Bradley Center in a manner that would give rise to mistaken arrests. Instead, it was structured to prevent mistaken arrests by having plainclothes officers observe violators and maintain eye contact with them until an arrest was made. The plainclothes officer, moreover, was required to confirm that the uniformed officers apprehended the right person. The fact that Arlotta does not assert that other people were wrongfully arrested is strong evidence that the MPD's plan actually worked. If Officer Chin did, in fact, cause Arlotta to be improperly arrested, it was because he did not follow the MPD policy, not that the policy itself was deficient. Thus, Arlotta has failed to establish sufficient causation between the City's policy and his arrest sufficient to sustain his § 1983 claim.

Arlotta also contends that his detention, some 4 hours or so, was unconstitutional because it was unreasonably long. He does not, and could not, argue that being booked on such a minor charge was unconstitutional. *See Doe v. Sheriff of DuPage County*, 128 F.3d 586, 588 (7th Cir. 1997) ("[T]he 'booking' of an arrestee, which for one thing confirms the person's identity, does not violate the Fourth Amendment[,] . . . even when the arrest is for a minor matter, and even if the arrestee is ready and able to post bail immediately.")

---

[2] (...continued)
*Tyson*'. . . before recognizing that the case is no longer binding precedent but simply a relic for the constitutional historians." *Id.* at 819.

(internal citations omitted); *see also*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354-55 (2001) (lawful to summarily arrest individuals for fine-only offenses).

Arlotta argues that the City of Milwaukee "offered no reason for a 2-hour delay in transporting the plaintiff-appellant the four blocks" from the Bradley Center to the police station, where he was booked. As we have held, a 4-hour post-arrest detention requires "an explanation" from the government. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987). Here, the MPD met its burden to justify the reasonableness of Arlotta's detention.

As an initial matter, on appeal, Arlotta exaggerates the length of time he spent detained in the police van. In his brief, Arlotta claims he remained in the van for 2 hours. In both his deposition and his complaint, however, he says he was in the van for approximately 1 hour.

The delay in transporting Arlotta was, moreover, reasonable. The procedure in this unusual effort to corral scalpers was to keep arrestees on the scene until the police van was full, or until a half hour after the game started, then transport all arrestees to the police station for processing at the same time. This sensible procedure was not unreasonable. There were only a limited number of police officers on the assignment, and forcing them to transport an arrestee as soon as an arrest was made would have diminished the success of their plan to enforce the ordinance. Arlotta would have the police, every time an arrest is made, drive the arrestee immediately to booking. Instead of looking for other suspects, the police would have been running a taxi service—dealing with only a few arrestees in an evening. While it certainly would have been more convenient for Arlotta if he were taken to the station for booking right away, considering the demands on the police

that evening, it was reasonable to wait to transport him while other arrests were being made.

Nor were the hours Arlotta spent at the police station unreasonable. Arlotta (and, it seems, the other arrestees) were kept in custody only as long as it took their processing officer to complete the steps necessary to finish the booking procedure. The arrest occurred in the early evening when the police station was busy. When a big group is arrested at the same time, a natural booking backlog is not unusual. *Compare Gramenos*, 797 F.2d at 436-37 (reversing summary judgment where city offered *no explanation* for 4-hour detention in the "dead of night" where there was evidence to suggest that they kept the arrestee locked up "out of spite").

Arlotta's claims against the Bradley Center, a private entity, are even weaker. The Bradley Center can only be liable under § 1983 if it engaged in illegal joint action with the MPD. *Malak v. Associated Physicians, Inc.*, 784 F.2d 277 (7th Cir. 1986). The Bradley Center, by seeking police help in dealing with ticket scalpers, did not engage in any joint action with the MPD to enforce the city's ordinance. And as we have already noted, the plan for dealing with ticket scalpers itself did not cause Arlotta to be unconstitutionally arrested. If Arlotta has a case for false arrest, it is against Officer Chin. But that issue is not before us.

The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

 

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*