# In the
# United States Court of Appeals
## For the Seventh Circuit

───────────

No. 03-1329

STEVEN CHORTEK, GREG HEITZ,
JERRY MASON, et al.,

*Plaintiffs-Appellants,*

*v.*

CITY OF MILWAUKEE, ARTHUR L. JONES and
CITY OF MILWAUKEE POLICE DEPARTMENT,

*Defendants-Appellees.*

───────────

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 323—**J.P. Stadtmueller**, *Judge.*

───────────

ARGUED SEPTEMBER 9, 2003—DECIDED JANUARY 23, 2004

───────────

Before CUDAHY, EASTERBROOK and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Fifteen plaintiffs brought this action under 42 U.S.C. § 1983 against the City of Milwaukee ("the City"), the Milwaukee Police Department ("the MPD"), and the police chief. The plaintiffs alleged that the defendants had violated their constitutional rights when the plaintiffs were arrested for selling tickets in the vicinity of the Bradley Center, Milwaukee's sports and entertainment arena. The

defendants moved for summary judgment. After a hearing, the district court granted the motion and dismissed the plaintiffs' claims. The plaintiffs appeal. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

Milwaukee city ordinances prohibit a "direct seller" from "engag[ing] in direct sales on any public way or other public premises," Milw. Mun. Ord. 95-1, and prohibit anyone from "sell[ing] or offer[ing] to sell" tickets on a public street or sidewalk within five hundred feet of the Bradley Center during the time between two hours before and one hour immediately after any scheduled event, *id.* 105-56(2)(b). The penalty for violation of either of these ordinances is a fine plus the costs of prosecution. *See id.* 95-1(12), 105-56(3). The plaintiffs were arrested for allegedly violating these ordinances.

### 1. Bradley Center Initiative[1]

In January 2001, the Milwaukee Police Department received complaints from the Bradley Center regarding ticket scalpers who bothered arriving fans. Bradley Center representatives believed that the number of regular ticket scalpers was increasing and found that they were unable to

---

[1]  The initiative is also described in this court's recent opinion in *Arlotta v. Bradley Center*, No. 03-1584, slip op. (7th Cir. Nov. 18, 2003).

handle the problem on their own. In response, the MPD launched an initiative that called for police to arrest and jail every person observed selling tickets in violation of the ordinances. The initiative was designed as an undercover operation. A plainclothes officer who observed a violation would call a uniformed officer, identify the offender and then confirm that the uniformed officer arrested the appropriate individual.

Those arrested were taken to a police vehicle behind the Bradley Center until one-half hour after game time. During that time, a representative from the Bradley Center read a prepared "Notice of Violation and Prohibition from Property" speech. The notice informed those arrested that they were no longer welcome at the Bradley Center and that they would be charged with trespassing if they returned. After the Bradley Center speech, those arrested were taken to the Prisoner Processing Section ("PPS") at the police administration building for booking, processing, citations and release.

Lieutenant Gary Edman, with the approval of Deputy Chief Leslie Barber, made the decision to arrest summarily all offenders, regardless of whether they were "first-time" offenders or "regular" ticket sellers. Lieutenant Edman later testified that on-the-scene citations had been ineffective in deterring violations of the ordinances: "[P]eople were given tickets, released on the scene, and they continued engaging in scalping tickets. And again, they were involved with harassing the fans coming into the Bradley Center." R.27, Ex.F at 37-38. Lieutenant Edman explained: "[T]hat's when we decided to take a more affirmative action as it relates to arresting and detaining people violating the scalping ordinance." *Id.* at 38. Chief Arthur Jones testified that summary arrest procedures are appropriate under certain circumstances, depending in part on "the number of people

we're going to take into custody, the conduct that they're engaged in, and the potential for them to return and engage in that same conduct—or I mean not return, never leave." *Id.*, Ex.E at 20. MPD policy permitted the summary arrest of individuals who committed ordinance violations when, in the discretion of the officer, arrest was necessary. Additionally, MPD policy permitted supervisors to implement a summary arrest procedure for a class of ordinance violations if the supervisor deemed summary arrests to be appropriate for that class of violations. The Bradley Center initiative, as designed by Lieutenant Edman and approved by Deputy Chief Barber, fell within the confines of these MPD policies.

Because the Bradley Center fell within the jurisdiction of Police District 1, those arrested as part of the Bradley Center initiative were subject to the standard processing routine at PPS. Processing at PPS involved a series of procedures related to booking, searches, paperwork and release. After arriving at PPS, the arrestees waited fifteen minutes to one-half hour to have their name, charges and other information entered into the police blotter. An officer then prepared an order for detention, and the arrestee entered the booking room. In the booking room, the arrestee removed outerwear, which was inventoried, and submitted to a thorough search. The arrestee then completed a medical-screening form. After the search, police placed the arrestee in a gender-specific holding cell while the paperwork was completed. Although PPS officers performed the search and other booking procedures, the arresting officer had to remain present.

The arresting officer also had to fill out and complete an arrest and detention report (the "ADR"). The ADR required the arresting officer to receive a "want" package, which is a computer teletype processed by the Bureau of

Identification. The "want package" lists local, extended state and national outstanding warrants, as well as an individual's criminal record. Processing time for the "want" package typically varies and depends upon the number of requests made to the Bureau of Identification at that time. The ADR usually requires about one-half hour to complete, but it can take longer when an officer arrests more than one person at the same time.

After the shift commander approved the completed ADR, the arrestee was issued a citation. The citations required "a fairly lengthy supplemental narrative on the back." *Id.*, Ex.G at 12. Once a PPS sergeant reviewed the paperwork, the arrestee received his belongings and was released. Supervisors at PPS monitored the progress of the booking process. The length of the processing time was affected by the total number of people being processed at PPS as well as by the number of people for which the arresting officer was responsible. Although efforts were made to expedite processing, the paperwork was "extensive" and "easily" required six to eight hours to complete. *Id.*, Ex.I at 31-33.

## 2. Arrests and Booking of the Plaintiffs

The fifteen plaintiffs were among the individuals arrested as part of the Bradley Center initiative for selling tickets in violation of the Milwaukee municipal ordinances. The plaintiffs were detained at PPS from approximately three to fourteen and one-half hours while the administrative processing steps were completed. They underwent the procedures previously described. With one exception, the plaintiffs were not allowed to make phone calls during their

detention. With one exception, they were released between 11:00 p.m. and 4:00 a.m.[2]

The plaintiffs underwent certain treatment they found objectionable. For example, some report that they were required to kneel in the police car, that they were humiliated at being arrested in front of people going to the game, that they were afraid in the holding cell because of other prisoners, and that they suffered anxiety knowing spouses would be concerned about their whereabouts. One testified that he was threatened by an officer with lengthier detention for asking what was taking so much time.

## B.  District Court Proceedings

The district court granted summary judgment to the defendants. On its own motion, the court denied class certification to the arrestees. It also dismissed claims against the MPD as a non-suable entity under § 1983. On the merits of the arrestees' claims, the district court held that the Eighth and Fourteenth Amendments did not apply. Although the Fourth Amendment applied, the district court found as a matter of law that it was not violated because arrests can be made for ordinance violations; police did not conduct the arrests and detentions in an extraordinary manner; and the lengths of the plaintiffs' detentions were reasonable.

The plaintiffs timely appeal the district court's entry of summary judgment on the Fourth Amendment claims.

---

[2] One of the plaintiffs held an out-of-state driver's license and had to follow additional processing procedures. He was detained for a total of approximately twenty-one hours but only for fourteen and one-half hours at PPS, until 9:30 a.m.

## II

## DISCUSSION

### A. Standard of Review

We review de novo a grant of summary judgment. *See Dykema v. Skoumal*, 261 F.3d 701, 704 (7th Cir. 2001). We view all facts and draw all inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate when there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

### B. Reasonableness of the Initial Arrests

The plaintiffs submit that their arrests for selling tickets in violation of the Milwaukee municipal ordinances were unconstitutional. Under Wisconsin Statute § 968.07(1)(d), a law enforcement officer may arrest when "there are reasonable grounds to believe that the person is committing or has committed a crime." The plaintiffs do not dispute that the arresting officers had probable cause to believe they violated Milwaukee Municipal Ordinances 95-1 and 105-56(2)(b).

Arrest for a minor, non-jailable offense does not violate the Fourth Amendment. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). When officers have probable cause to believe that an individual has committed an offense in their presence, they may arrest the offender. *See id.* In *Atwater*, a mother was arrested for the misdemeanor offenses of failing to wear and failing to have her children wear seatbelts. *See id.* at 323. The Supreme Court held that the Fourth Amendment did not prohibit arrest for these offenses. *See id.* at 354. *Atwater* makes clear that even non-violent misdemeanor

offenses, such as unauthorized ticket sales, can support an arrest under the Fourth Amendment, as long as the officer had probable cause to believe the offense had been committed.

The Court in *Atwater* noted, however, that individualized review may be appropriate "when a defendant makes a colorable argument that an arrest, with or without a warrant, was 'conducted in an extraordinary manner, unusually harmful to [his] privacy or even physical interests.' " *Id.* at 352-53 (quoting *Whren v. United States*, 517 U.S. 806, 818 (1996)). The Court then determined that the petitioner's arrest may have been "humiliating," but it was no more harmful to her privacy or physical interests "than the normal custodial arrest." *Id.* at 354. Similarly, in *Whren*, the Court noted that the traffic stop at issue did not "remotely qualify" as an extraordinary search or seizure. *Whren*, 517 U.S. at 818. When probable cause exists, only searches or seizures conducted in an extraordinary manner require a "balancing" analysis. *Id.*

The plaintiffs argue that individualized review is appropriate in their case given the minor nature of the offense. Particularly, they contend that they faced "much worse" treatment than did the plaintiff in *Atwater*. The differences, they emphasize, relate primarily to the length of time spent handcuffed in a police vehicle, the thoroughness of the body searches, their inability to make phone calls and the fact that they had to share a holding cell with other prisoners rather than being placed in holding cells alone. We cannot say, however, that this treatment is "unusually harmful" to physical interests or privacy. *Cf. Whren*, 517 U.S. at 818 (listing examples of extraordinary searches and seizures as "seizure by means of deadly force . . . unannounced entry into a home . . . entry into a home without a warrant . . . or physical penetration of the body" (internal citations omit-

ted)). Indeed, the plaintiffs' situation was quite similar to that of the petitioner in *Atwater*: The arrests may have been "humiliating," but they were no more harmful "than the normal custodial arrest." *Atwater*, 532 U.S. at 354.

## C.  Reasonableness of the Detentions

After being taken into custody, the plaintiffs waited for some time to be transported to PPS. They were then detained at PPS between three and fourteen and one-half hours. All but one of the plaintiffs was detained over four hours. Twelve of the fifteen were detained over six hours. Six were detained over eight hours. The plaintiffs complain that the length of these detentions was constitutionally unreasonable.

### 1.  Length of the Detentions

An excessive length of detention may be sufficient to violate the reasonableness requirement of the Fourth Amendment. The Supreme Court held in *Gerstein v. Pugh*, 420 U.S. 103 (1975), that an officer's "on-the-scene assessment of probable cause" justifies an arrest and "a brief period of detention to take the administrative steps incident to arrest." *Id.* at 113-14. The Court also held that individuals arrested without a warrant are entitled to a timely and judicial determination of probable cause prior to "extended restraint of liberty following arrest." *Id.* at 114; *see also id.* at 126. The Court left unspecified in *Gerstein* just how "promptly" a probable cause determination had to be made, *see id.* at 125, but in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Court clarified that a determination of probable cause within forty-eight hours is presumptively reasonable, *see id.* at 56. In the case of detentions over forty-

eight hours, the government bears the burden of proving an emergency or other extraordinary circumstance which justifies the delay. *Id.* at 57.

*County of Riverside* is generally invoked to evaluate cases involving extended detention because the forty-eight hour framework governs the length of time which may elapse before a probable cause hearing. *See, e.g.*, *Kyle v. Patterson*, 196 F.3d 695, 696 (7th Cir. 1999); *United States v. Sholola*, 124 F.3d 803, 819-21 (7th Cir. 1997). Here, neither extended detention of the plaintiffs nor probable cause hearings were contemplated. Rather, police held the plaintiffs only while they completed their processing. *County of Riverside* is relevant to this discussion, nonetheless, because the Court noted in *County of Riverside* that unreasonable delays, even within the forty-eight hour period, may be constitutionally troublesome. *See County of Riverside*, 500 U.S. at 56. The Court specified: "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* Thus, under *Gerstein* and *County of Riverside*, the length of time taken to complete administrative steps incident to arrest must be reasonable.

This court has addressed previously the reasonableness of the length of detention during administrative steps. In *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir. 1985), we required defendants to explain why individuals spent more than four hours in jail after they were arrested in the middle of the night for a minor offense. *See id.* at 1350-51. Similarly, in *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986), an individual was arrested for shoplifting and detained for four hours in the middle of the night. *See id.* at 437. As to the length of detention, we noted:

It is premature to say how long is too long under the fourth amendment. On remand the police should explain what must be done after an arrest for shoplifting and why reasonably diligent officers need more than four hours to do it. The court also should determine whether four hours is an acceptable period for a non-violent misdemeanor.

*Id.* We also suggested that "[i]f the police choose to perform time-consuming tasks after an arrest, perhaps they must do so on their own time rather than the suspect's, issuing a citation rather than keeping the suspect locked up in the interim." *Id.* We later stated that the reasonableness of a length of detention typically "is a question best left open for juries to answer based on the facts presented in each case." *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (holding that an eleven-hour detention of individual waiting to be discharged presented a jury question).

All but one of these plaintiffs was held for longer than four hours at PPS. Many were held substantially longer than four hours. Under *Moore* and *Gramenos*, we require an explanation for the length of the plaintiffs' detentions. *See also Arlotta v. Bradley Center*, No. 03-1584, slip op. at 11 (7th Cir. Nov. 18, 2003) (evaluating government's explanation of the length of detention of an individual arrested as part of the Bradley Center initiative).

The defendants explain the length of the detention as a product of backlog. They note that PPS is the processing facility for the downtown area, that PPS is busiest in late evening to early morning and that the arrest of large groups can cause a backlog at PPS. The defendants also note that supervisors monitored the progress of the booking process and that arresting officers processed the paperwork as quickly as they could, given the number of arrestees for which each was responsible and the number of arrestees at

PPS. The plaintiffs, on the other hand, have not argued that the detention times were the result of "delay for delay's sake," *County of Riverside*, 500 U.S. at 56, or for any other impermissible reason.[3] They merely assert that the times were unreasonably long.

The detention times of the plaintiffs, on average, were significantly longer than the four-hour periods which gave us pause in *Moore* and *Gramenos* and which another panel of this court evaluated in *Arlotta*. Nonetheless, in the absence of any evidence of improper purpose for the delay, we believe the government has provided a sufficient explanation. *Cf. Gramenos*, 797 F.2d at 436-37 (noting lack of evidence of time required to complete tasks and evidence of punitive intent); *Moore*, 754 F.2d at 1350-51 (noting absence of *any* evidence justifying length of detention). The Supreme Court cautioned in *County of Riverside* that, in evaluating the reasonableness of delay, "courts must allow a substantial degree of flexibility." *County of Riverside*, 500 U.S. at 56. The Court warned:

> Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to an-

---

[3] We have reviewed the record carefully and have discovered no evidence that the plaintiffs were held for any improper purpose. *See Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 436 (7th Cir. 1986) (noting additional evidence that police held individual "out of spite—or perhaps to impose the real punishment for shoplifting"). Although Lieutenant Edman described the initiative as a "more affirmative action," R.27, Ex.F at 38, that statement must be considered in the context of the perceived ineffectiveness of citations given on the scene. Alone, the comment does not provide evidence of improper purpose. Furthermore, the plaintiffs have not argued that police held them out of spite or with intent to punish.

other, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

*Id.* at 56-57. The Court issued this warning in reference to determinations about the reasonableness of delay in probable cause determinations, but the circumspection the Court advises applies to this situation as well. We must conclude, therefore, that the length of the plaintiffs' detentions was not constitutionally unreasonable given the natural backlog in processing at PPS.

## 2. Municipal Liability

Even had the length of the detentions warranted a jury determination of reasonableness, the plaintiffs could not succeed on their § 1983 claim against the City.[4] The Supreme Court determined in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that a government entity is only liable under § 1983 when execution of a government policy or custom "by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" inflicts the injury of which the plaintiff complains. *Id.* at 694; *see Henry*

---

[4] The plaintiffs also have sued Chief Jones but have not specified whether they are bringing their claims against him in his official capacity or his individual capacity. There is no evidence that Chief Jones was personally involved in the arrests of the plaintiffs or the development of the Bradley Center initiative. We consider the suit against him, therefore, to be in his official capacity. Claims against Chief Jones in his official capacity suit are effectively claims against the City. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

*v. Farmer City State Bank*, 808 F.2d 1228, 1237 (7th Cir. 1986) (noting that plaintiffs must prove that their injury "was caused by an official municipal policy or custom"); *see also Arlotta*, slip op. at 8 ("To state a § 1983 claim against a municipality, a complaint must allege that a constitutional deprivation was caused by an official policy or custom."). We do not believe the plaintiffs can establish that the length of their detentions was caused by an "official policy or custom."

Our case law establishes that unconstitutional policies or customs take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury. *See Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). The plaintiffs attempt to proceed under the first method by establishing an express policy. Only those individuals with the requisite policymaking authority are capable of establishing "official policy" as required by *Monell. See Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1324-25 (7th Cir. 1993).

The plaintiffs argue that the Bradley Center initiative constituted a policy upon which to predicate § 1983 liability. They contend that the decision to arrest summarily all offenders, combined with the standard processing procedures at PPS, led to constitutional injury. We cannot agree with these contentions.[5]

---

[5] We note that, in *Arlotta*, another case involving claims of a plaintiff arrested as part of the Bradley Center initiative, another panel of this court determined that the plaintiff could not es-

(continued...)

The record indicates that Lieutenant Edman developed the Bradley Center initiative with the approval of Deputy Chief Barber.[6] The discretionary decisions of an employee without policymaking authority are insufficient to establish § 1983 liability. *See McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 510 (7th Cir. 1993); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality) (discussing insufficiency of decisions by subordinate municipal employees without

---

[5] (...continued)
tablish a § 1983 claim under *Monell* because causation between the alleged policy and the injury was lacking. *Arlotta*, slip op. at 10. Because our colleagues found causation to be absent, they did not specifically address whether the Bradley Center initiative qualified as an "official policy" under *Monell*. Our analysis does not disturb the reasoning in *Arlotta.*

[6] It is true that a departmental policy permitted the arrest and detention of fine-only offenders, but our focus must be on the more particularized decision to arrest ticket scalpers and subject them to the routine at issue. That particular decision was the alleged source of injury and provides the appropriate level of meaningful specificity. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1984) (plurality) ("[S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* [*v. Department of Social Services*, 436 U.S. 658 (1978),] will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal policy can be identified behind almost any such harm inflicted by a municipal official . . . ."); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.").

final decisionmaking authority); *Fiorenzo v. Nolan*, 965 F.2d 348, 351 (7th Cir. 1992) ("[A] municipality is not liable merely because the official who inflicted the alleged constitutional injury had the discretion to act on its behalf; rather, the official in question must possess final authority to establish municipal policy with respect to the challenged action."). Whether the lieutenant or the deputy chief had the authority to set official policy is a question of state law. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619 (7th Cir. 2001); *see also Praprotnik*, 485 U.S. at 124 (plurality). There is no indication that these officers had policymaking authority; rather, the police chief is charged with the command and rule-making responsibilities for the police department under Wisconsin law. *See* Wis. Stat. § 62.09(7)(c) & (13)(a); *see also Monfils v. Taylor*, 165 F.3d 511, 517-18 (7th Cir. 1998) (refusing to find municipal liability based on the acts of a Wisconsin deputy chief when evidence did not establish ratification by the police chief). There is no evidence that Chief Jones was involved in the development of the Bradley Center initiative.[7] Without the involvement of a policymaker, the decisions of subordinate employees do not suffice to establish municipal liability. Thus, the plaintiffs cannot succeed on their § 1983 claim against the City.

## Conclusion

Because the plaintiffs' arrests and detentions did not violate the Fourth Amendment and because the plaintiffs cannot establish an official policy or custom, the district court correctly entered summary judgment in favor of the

---

[7] As noted, any claim against Chief Jones in his individual capacity would also fail for this reason.

defendants on the plaintiffs' § 1983 claims. We affirm the decision of the district court.

AFFIRMED

CUDAHY, *Circuit Judge*, concurring. Although one may doubt some of the reasons advanced by the City for the prolonged period of detention here, there is enough evidence (but barely) to support the majority's conclusion that the explanation of the detention's length was reasonable. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991) (cautioning reviewing courts to allow "a substantial degree of flexibility" in determining reasonableness because delay caused by administrative tasks is often unavoidable). However, the majority touches upon a question (not raised here by the plaintiffs) that remains something of a mystery since *Atwater v. City of Lago Vista* had very little to say explicitly about it: to what extent, if any, is the validity of an arrest and detention for a fine-only offense affected by the purpose or motive of the arresting officer? The *Atwater* court frequently cited *Whren v. United States*, 517 U.S. 806 (1996), as relevant here, and *Whren*, of course, established that motive or purpose was not relevant to the validity of a traffic stop. Perhaps, this is a signal that they are equally irrelevant here. In addition, the *Atwater* court dismissed the need for a case-specific balancing test in determining the reasonableness of an arrest unless it is "conducted in an extraordinary manner, unusually harmful to [his] privacy or even physical interests." *Atwater v. City of Lago Vista*, 532 U.S. 318, 353 (2001), quoting *Whren*, 517 U.S. at 818.

On the other hand, the majority opinion suggests that "punishing" an individual by arresting and detaining him is not a proper purpose for engaging in those procedures (citing our pre-*Atwater* decision in *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 436-37 (7th Cir. 1986), in which we noted that there was "some evidence that the police held Gramenos out of spite—or perhaps to impose the real punishment for shoplifting"). Yet the entire sequence here involved a scheme to deter repeat offenders for whom the mandated punishment—a citation and a fine—was not sufficient. This could constitute a punishment by ordinary definitions of the term.[1] *See Ewing v. California*, 538 U.S. 11 ___, 155 L. Ed. 2d 108, 120, 126 (2003) (noting that purposes of criminal punishment are "deterrence, incapacitation, retribution and rehabilitation").

However, as indicated earlier, this issue has not been raised or litigated (and perhaps, in light of *Atwater*, it is not an issue), so it does not present a barrier to summary judgment.

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[1] *See, e.g.*, Appellants' Br. at 5, citing Deposition of James Klein at 45 ("Mr. Klein asked the arresting officer what was taking so much time for his release from confinement, and he was told that if he was smart with the officer, he would be held an additional three hours.").