**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 2, 2012[*]
Decided May 4, 2012

**Before**

KENNETH F. RIPPLE, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

DIANE S. SKYES, *Circuit Judge*

No. 11-3724

| | |
|---|---|
| JANELLE L. BARLASS, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Western District of Wisconsin. |
| | |
| *v.* | No. 10-cv-454-slc |
| | |
| CITY OF JANESVILLE, WISCONSIN, et al., | Stephen L. Crocker, |
| *Defendants-Appellees.* | *Magistrate Judge.* |

**O R D E R**

Janelle Barlass operated "Corvinas," a bar in Janesville, Wisconsin, before she surrendered the premises after a dispute with her landlord. In this action under 42 U.S.C. § 1983 and Wisconsin law, Barlass alleges that the City and its former deputy chief of police, Steven Kopp, harassed her and her customers partly because the clientele was predominately African American, and partly because she had accused the police department of racism at a July 2009 public hearing conducted by the City's alcohol-licensing authority. This harassment, Barlass claims, denied her patrons equal protection and violated her rights under the First Amendment. She also claims that the *Janesville Gazette* and the owner of a neighboring bar, Denise Carpenter, defamed her in reporting and commenting

---

[*]After examining the briefs and record, we have concluded that oral argument is unnecessary. Thus we deny Barlass's motion requesting oral argument, and the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(a)(2)(c).

about nuisance allegations leveled against her establishment. (Barlass has abandoned additional claims that were brought against these and other defendants but dismissed at screening. S*ee* 28 U.S.C. § 1915(e)(2)(B); *Rowe v. Shake*, 196 F.3d 778, 781 (7th Cir. 1999).)

The defendants all moved for summary judgment and submitted proposed factual findings complying with a standing rule of the magistrate judge presiding by consent. Barlass was (and still is) pro se, but none of the defendants included the warnings required about the workings of Federal Rule of Civil Procedure 56. *See Timms v. Frank*, 953 F.2d 281, 283–85 (7th Cir. 1992). Barlass responded, though not in the form mandated by the standing rule and, in many instances, without citing evidence in the record to substantiate her factual assertions. In ruling for the defendants, the magistrate judge noted Barlass's noncompliance with the standing rule yet, after saying that her submissions would be disregarded, apparently parsed those materials and concluded that her admissible evidence did not create any material dispute of fact. As part of our de novo review, *see Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009), we likewise have evaluated the admissible evidence Barlass submitted in the district court, which allows us to pass over Barlass's contention that the magistrate judge improperly refused to consider her submissions at summary judgment, *see Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 n.3 (7th Cir. 2004); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004). The following account is presented in the light most favorable to Barlass and, except as noted, is uncontested. *See Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 522 (7th Cir. 2008).

Barlass and a silent partner, Amir Sharifi, opened Corvinas in October 2008. Their landlord initially owned the establishment's liquor license, but Barlass and Sharifi formed Corvinas Exchange, LLC, in early 2009 to facilitate its transfer to them. In May of that year the Janesville Common Council approved the transfer to Corvinas Exchange as recommended by the municipality's Alcohol License Advisory Committee. Already, though, Corvinas had generated concerns about underage drinking and an increase in calls to the Janesville police, and both the Advisory Committee and the Common Council voiced concerns. The Council warned Barlass and Sharifi that not addressing those concerns risked having the liquor license revoked.

Yet only a month after the license transfer, an underage woman reported that she had been stabbed near the bar after her fight with another underage woman had spilled from Corvinas into the street. Barlass later was convicted of allowing a minor into the establishment. The day after this incident Deputy Chief Kopp, the police department's liaison to the Advisory Committee, directed Barlass and Sharifi to appear before the Committee on July 7. He also drafted a memo for the Committee describing the stabbing and generated from a computer database a list of 47 police contacts with Corvinas between January 1 and the middle of June, two weeks before the stabbing. Many of these interactions

arose from routine "walk throughs" conducted by officers, and most did not result in preparation of a written report. The six contacts during the first half of June included four in which officers had responded to complaints about disorderly conduct, theft, excessive noise, and trespass. Kopp's memo advised the Committee that it could continue monitoring Corvinas or recommend that the Common Council suspend or revoke the bar's liquor license.

Barlass and Sharifi attended the July 9 session, which was open to the public. Members of the Advisory Committee expressed continuing concern about Corvinas, but Barlass retorted that the police department was exaggerating the situation. She accused the police of singling out Corvinas for heightened scrutiny because the bar catered primarily to African Americans. As proof she recounted a past incident where an officer had entered Corvinas when five or six African Americans were present and remarked sarcastically that it "[l]ooked like trouble in here." Barlass would later say that two officers (none of the three was Deputy Chief Kopp) had strolled into Corvinas and suggested that she stop playing hip-hop music lest she "end up like Spankys," another Janesville bar that had been popular with African Americans before losing its license due to violent incidents. Kopp declared the accusation of racism "out of line" and insisted that Corvinas was getting more attention because of overcrowding and unruly patrons. That view was echoed by Carpenter, who told the Advisory Committee that Barlass and Corvinas were "giving downtown a bad name and bad press" and hurting business at her own bar, "Quotes," because downtown was "no longer viewed as a safe place to come." This July session ended with Kopp saying the police department was not ready to advocate suspending or revoking Corvinas's liquor license, and the Committee deciding to withhold recommending those steps.

Barlass appeared again before the Advisory Committee on August 4, 2009. Deputy Chief Kopp reported that the problems with Corvinas had not abated. During the previous month there had been reports of drug use and sales outside the bar, arrests for battery and disorderly conduct, an assault by a patron on the bar's security manager, and a complaint from the owner of an adjacent building that patrons from Corvinas were urinating and vomiting on his building. But Kopp again stopped short of recommending that the Advisory Committee take action and noted that there was "nothing threatening from a police perspective."

Later in August, however, Sharifi informed the City that he was "resigning" from Corvinas Exchange. The City interpreted Sharifi's action to constitute a "substantial change in ownership" compelling Barlass to obtain a new alcohol license. *See* JANESVILLE MUN. CODE § 5.06.200. (Barlass asserts that the City *misinterpreted* the significance of Sharifi's communication and the effect that his "resignation" had on their limited liability company, but she does not dispute that the City did conclude that Sharifi's action had invalidated the

liquor license.) Barlass did not reapply for the license because, within a few days of Sharifi's contact with the City, she had been notified by Corvinas's landlord that he intended to seek eviction for nonpayment of rent. After consulting with her lawyer, Barlass opted to surrender the premises, and by the end of August her bar was shuttered.

The *Gazette* published in its print and online editions several articles about the controversy surrounding Corvinas. Only two of those articles are central to this appeal. On August 3, 2009, the newspaper posted an article entitled "Trouble Plagues Bars that Cater to a Growing Minority Population." Deputy Chief Kopp was interviewed for that story, which noted that "Kopp said that police are scrutinizing Corvina's [sic] out of concerns of officers, two nearby bar owners, another neighbor of Corvina's and passersby." Later, on July 30, 2010, the *Gazette* posted an article entitled "Janesville Bar Closes Following Complaint," which described the failure of "McstAggers," the bar that replaced Corvinas after it closed. The article recounted the history of Corvinas, noting that it had "attracted unfavorable attention for crowds gathering outside the bar, violent behavior and underage drinking."

Barlass filed suit in September 2010. She was deposed several times by the defendants. On one occasion she clarified that her retaliation claim against Deputy Chief Kopp concerned false statements he made after the July Advisory Committee meeting, apparently referring to statements he made to a *Gazette* reporter on August 3 and to the Advisory Committee a day later. According to Barlass these statements were false, and were intended as punishment for her accusations of racial bias. These "false" comments, Barlass conceded, were the extent of Kopp's personal involvement in the alleged retaliation. During a different deposition Barlass was asked if, before filing suit, she had notified the *Gazette* about her allegation that its stories included falsities. She testified that her lawyer had drafted one letter, dated July 16, 2009, which she had delivered to the *Gazette*. By her account, that letter demanded that the paper "stop printing . . . inaccurate statements regarding violent behavior and the underage drinking, talking about pushing fights outside, curbing the violence." Her lawyer denies drafting a letter to the paper, and Barlass could not produce a copy of this correspondence. If the newspaper received it, the letter did not make its way to the editor responsible for taking corrective action.

In granting summary judgment for the defendants, the magistrate judge first questioned whether Barlass had suffered a sufficient injury to confer Article III standing to claim that the actions of the City and Kopp had violated the Equal Protection Clause. The court reasoned that the departure of Sharifi was the reason that Corvinas closed, and that Barlass lacked admissible evidence showing that the defendants had provoked his departure. The magistrate judge added, however, that "one could infer that Barlass is contending that defendants' actions caused a loss of business income before Sharifi withdrew from the LLC; this probably would be enough to establish Barlass's standing."

Thus, after concluding that Barlass is not asserting an infringement of her own right to equal protection, the court addressed whether she has "prudential" standing to enforce the equal-protection rights of her patrons. The court concluded that she does not, since the third-party interest in serving African-American patrons actually belonged to Corvinas Exchange, not Barlass personally, and the limited liability company is not party to the suit.

As for the First Amendment claim against the City and Kopp, the magistrate judge first concluded that the City cannot be liable because Barlass lacks evidence of a municipal "custom, policy or practice" of retaliating against bar owners who make accusations of racial prejudice. *See Monell v. City of New York Dep't of Social Servs.*, 436 U.S. 658 (1978). And the claim against Kopp fails, the court reasoned, because Barlass presented no evidence that his statements to the Advisory Committee or to the *Gazette* were intended to retaliate against Barlass for her accusations, or even that his statements were substantially false.

Concerning Barlass's state-law claims, the magistrate judge concluded that Barlass cannot recover against Carpenter for criticizing Corvinas, because Wisconsin law does not allow plaintiffs to bring defamation claims on behalf of others, and Corvinas Exchange is not a plaintiff. Finally, in granting summary judgment for the *Gazette*, the court reasoned that WIS. STAT. § 895.5(2) requires a plaintiff in a defamation suit against a media source to provide notice of the allegedly defamatory article before filing suit. The court noted that the *Gazette* editor was unaware of a letter from Barlass and observed that, to the extent that Barlass had testified that she sent one, her description of the letter's content could not establish compliance with § 895.5(2), which requires notice about the specific article containing a falsehood.

Summary judgment is appropriate when a nonmoving party fails to provide sufficient evidence to permit a jury to return a verdict in its favor. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008). The nonmoving party bears the responsibility of designating specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Barlass makes only a token effort to challenge the magistrate judge's finding that she lacked "prudential" standing to pursue her equal-protection claim and has all but abandoned the point by failing to cite to any relevant legal authority. FED. R. APP. P. 28(a)(9); *Correa v. White*, 518 F.3d 516, 517 (7th Cir. 2008); *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). In any event, the district court's only error was in concluding that Barlass has Article III standing. Whether a plaintiff would have prudential standing is irrelevant if she does not have Article III standing. *See RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010). While Barlass successfully established Article III standing at the pleading stage by broadly alleging that the heightened police scrutiny was "very damaging" to her personally,

annoyed her patrons, and caused her to lose revenue, at summary judgment she was required to provide "specific facts" in order to maintain that standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 919 (7th Cir. 2003). Barlass submitted no evidence showing a concrete injury attributable to the purported campaign of harassment, nor did she submit evidence suggesting a causal link traceable to the actions of the City and Kopp. Thus, the magistrate should not have reached the question of prudential standing, and should have granted summary judgment to the City and Kopp on Article III standing grounds.

Barlass also presses her retaliation claims against the City and Kopp, but we see no error in the district court's rejection of her *Monell* claim. Barlass's suit against the City required a showing that the City had an express policy or widespread "custom" of retaliation, or else that a City official with final decision making authority retaliated against her. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004). But Barlass concedes in her reply brief that "there is no claim being made to policy or custom over plaintiff's protected speech." And she did not make any showing that either the Advisory Committee or Kopp had final decisionmaking authority over the level of police scrutiny over Corvinas. Indeed, Kopp filed an affidavit denying that he possessed policymaking authority.

Barlass also rehashes her retaliation claim against Kopp, but although her brief discusses the increased police presence at and around Corvinas after her comments to the Advisory Committee in July 2009, she does not allege that Kopp was a part of that presence nor that it was done at his direction. She stated at her deposition that Kopp had retaliated by making false statements about Corvinas; the magistrate noted that he was uncertain which statements she had been referring to, but assumed that she was referring to Kopp's statements at the August Advisory Committee meeting and his comments in an August 3, 2009, *Gazette* article. Barlass does not dispute this understanding on appeal, and so we will assume that those were the false statements she was referring to.

But Barlass makes no attempt in her brief to rebut the magistrate judge's conclusion that she failed to produce evidence that Kopp's public comments were false; her evidence that Kopp lied at the Advisory Committee hearing consists of an absence of police reports corroborating his statement that others had expressed concerns to him. But as the magistrate judge explained, such concerns would not necessarily result in official police action or arrests. And the court correctly observed that many of the incidents Kopp described to the *Gazette* are corroborated by police reports that Barlass herself submitted as exhibits. Accordingly, we agree with the court that no reasonable jury could find from the admissible evidence that Kopp's statements were made in response to Barlass's accusation of racism or were intended to harass, ridicule, or threaten her. *See Hutchins v. Clarke*, 661 F.3d 947, 956–57 (7th Cir. 2011); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). Indeed, Kopp told the

Committee that he did not recommend revoking Corvinas's bar license and that the incidents he cited presented "nothing alarming from a police perspective." He was similarly conciliatory in his comments to the *Gazette*, noting that Corvinas had experienced fewer "serious incidents" than Spanky's.

Barlass also appeals the grant of summary judgment to Carpenter, insisting that the district court erred by concluding that Carpenter's statement at the July 2009 hearing referred only to Corvinas, and not Barlass personally. Even if we conclude that this decision is erroneous, it would make no difference; Carpenter was speaking on a matter of public concern, and so under Wisconsin law Barlass bears the burden of proving, by clear and convincing evidence, that Carpenter knew that her statements were false, or that she spoke with a reckless disregard for the truth. *See Polzin v. Helmbrecht*, 196 N.W.2d 685, 690 (Wis. 1972); *see also Schaefer v. State Bar of Wisconsin*, 252 N.W.2d 343, 346 (Wis. 1977); *Mach v. Allison*, 656 N.W.2d 766, 772 (Wis. Ct. App. 2002). Barlass produced no evidence showing or tending to show that Carpenter's statements about the harm that Corvinas was causing to her business and the reputation of downtown Janesville were false.

Barlass next argues that the magistrate judge erred by finding that she failed to provide pre-suit notice to the *Gazette*, but her arguments on this point are conclusory and do nothing to challenge the court's reasoning. Barlass avers that her attorney drafted a letter notifying the paper of its purportedly false reporting, but the lawyer says otherwise. For purposes here this dispute must be resolved in favor of Barlass, but even by her account the letter she sent did not comply with the notice requirement of § 895.5(2), since it did not specify which article it was objecting to. For that reason the magistrate judge was correct in granting summary judgment for the *Gazette*.

We have reviewed the remaining contentions Barlass makes in her brief and conclude that none has merit.

AFFIRMED.