# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2728

JEFFREY WHITMAN,

*Plaintiff-Appellant,*

v.

VEROLJUB NESIC and CHRISTOPHER ELLERD,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 21—**William C. Griesbach**, *Judge.*

———————

ARGUED JANUARY 5, 2004—DECIDED MAY 18, 2004

———————

Before CUDAHY, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* On April 22, 1998, while incarcer-ated at the Racine Correctional Institution ("RCI"), Jeffrey Whitman was strip searched as part of RCI's random drug-testing program and made to stand naked for twenty minutes in a bathroom stall until he produced a urine sample. He brought this suit under 42 U.S.C. § 1983 against the correctional officer who conducted the strip and body-contents search, Veroljub Nesic, and against RCI's security director, Christopher Ellerd. Whitman, who has served approximately twelve years in the Wisconsin state

prison system, admits he has been strip searched possibly dozens of times without complaint. Yet, he alleges that the April 22, 1998 search constituted cruel and unusual punishment under the Eighth Amendment because it was unnecessary in conjunction with routine drug testing and because of the length of time he was made to stand naked while attempting to produce the required sample. The district court, in a thorough and well-written opinion, granted Nesic's and Ellerd's motion for summary judgment. We affirm.

## I.  Background

The facts are essentially not in dispute, and where they are—such as the amount of time Whitman was made to stand naked before he produced the urine sample—we have credited Whitman's version of events. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 745 (7th Cir. 2004) (noting that when reviewing a grant of summary judgment, "[w]e view all facts and draw all inferences in the light most favorable to the nonmoving party"). At the time of the search in question, the Wisconsin Department of Corrections ("DOC") maintained a drug-testing program that subjected inmates in its prison system, including those at RCI, to random testing, also called a "body-contents search." Every week, a computer program randomly selected five percent of the prison populace for testing based on cell, bed, or bunk numbers—not by name. That list was forwarded to a designated coordinator at each institution, and prisoners occupying the designated cells, beds, or bunks would be tested. At RCI, correctional officers on third shift (10:30 p.m. to 6:30 a.m.) would perform the testing. The purpose of the testing was to ensure the safety and security of the inmates, staff, visitors, and community by maintaining a drug-free prison populace. Random drug testing, combined with appropriate sanctions, was believed to suppress drug

use, drug trafficking, and drug-related infractions in the institutions, to reduce recidivism, and to help ensure that inmates released from DOC facilities were drug free.

On April 22, 1998, Nesic woke Whitman around 3:00 a.m. for drug testing. Nesic escorted Whitman to the common bathroom facilities used by inmates. Whitman entered a bathroom stall and completely disrobed for a strip search. The stall was in full view of the guard station some ten-to-thirty feet away; the station was staffed that night by two female officers. However, the opaque walls of the stall came up to Whitman's waist so that he could only be observed from the waist up and knees down by the female staff. Except for one inmate who walked in and walked right back out, Whitman was alone in the bathroom with the guards. The strip search consisted of Nesic's visual inspection of Whitman's nude body for contraband substances that could be used to contaminate the urine sample. It involved Whitman showing Nesic his hands, inside of his mouth, ears, bottoms of his feet, anus, and under his testicles.

After Nesic completed his visual inspection, he handed Whitman the specimen bottle and Whitman turned to the wall to produce the urine sample. Nesic remained outside of the stall, about two feet behind Whitman, and searched Whitman's clothes to ensure they contained no contaminants or someone else's "clean" urine sample that Whitman might attempt to substitute for his own. Contaminated urine samples or providing substitute samples was a demonstrated problem at RCI.

Whitman could not immediately produce a sample and asked that he be allowed to dress. Nesic instructed him that he could not until he produced a urine sample. Whitman believes it took him approximately twenty minutes to provide the required specimen. During that time, Nesic did not touch him, ridicule him, make fun of him, express any anger toward him, or threaten him; Whitman complains

only that Nesic "hovered" outside the stall, making it difficult to provide the sample. Nesic was required to watch the urine being deposited into the container, again to ensure the sample was not contaminated or substituted.

After Whitman succeeded in producing the sample, he was allowed to dress and return to his bunk. Both Whitman and Nesic admit there is no history of animosity between them, either before or after the April 22, 1998 search. While at RCI, Whitman was never the subject of sexual ridicule or ridicule because of his body.

Ellerd, Nesic, and Whitman agree that the procedure followed by Nesic on the night of April 22, 1998 was standard practice for the random drug tests performed at RCI (although Whitman's inability to produce a sample for twenty minutes was unusual). Prisoners were always made to produce the urine sample while nude. According to Ellerd, having inmates provide the sample while undressed helped to ensure a "clean" sample. For example, if allowed to dress, the inmate could access contraband not detected in the guard's search of the clothing. Whitman alleges he suffered psychological damage because of the strip search and prolonged nudity.

Although Ellerd was in charge of security for RCI, he had no personal involvement in drug-testing Whitman on April 22, 1998 or in training guards on the proper procedure for conducting a body-contents search.

## II.  Analysis

We review a district court's grant of summary judgment on a 42 U.S.C. § 1983 claim de novo. *Chortek*, 356 F.3d at 745. Whitman makes much of the fact that early on in this litigation he survived the defendants' Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, arguing that since a district judge found his complaint stated a claim under

§ 1983 at the preliminary stages of the litigation, his complaint must also survive summary judgment. His reliance on the favorable Rule 12(b)(6) decision is misguided. Where Whitman could rest on his pleadings when challenged by the Rule 12(b)(6) motion to dismiss, *see*, *e.g.*, *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001), he cannot do so in opposing a summary-judgment motion—he must affirmatively demonstrate that there is a genuine issue of material fact for trial, *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) *(*citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Where, as here, the plaintiff has failed to do so, the moving party is entitled to judgment as a matter of law. *Chortek*, 356 F.3d at 745 (citing Fed. R. Civ. P. 56(c)).

On summary judgment, the district court found that the April 22, 1998 strip search in conjunction with the random body-contents search did not constitute cruel and unusual punishment under the Eighth Amendment as understood in our constitutional jurisprudence. We agree.

"The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification." *Meriwether v. Faulkner*, 821 F.2d 408, 415 (7th Cir. 1987) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir. 1986)). In evaluating Eighth Amendment claims, courts conduct both an objective and a subjective inquiry. The objective prong asks whether the alleged deprivation or condition of confinement is "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotations omitted). If the conditions complained of pass this threshold, courts then must determine the prison official's subjective state of mind; that is, whether "he knows that inmates face a

substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847; *see also Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995).

In the context of bodily searches performed upon those incarcerated in our prison system, only those searches that are "maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification'" are considered unconstitutional. *Meriwether*, 821 F.2d at 418 (quoting *Rhodes*, 452 U.S. at 346); *see also Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). In other words, the search must amount to "'calculated harassment unrelated to prison needs,'" *Meriwether*, 821 F.2d at 418 (quoting *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)), with the intent to humiliate and inflict psychological pain, *Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004) (citing *Calhoun*, 319 F.3d at 939).

The strip search accompanying the body-contents search at issue here was plainly constitutional. Whitman doesn't challenge RCI's right to conduct random drug testing as a matter of institutional security. Rather, he objects to RCI's practice of strip searching inmates prior to taking the sample, requiring inmates to provide the sample naked, and, in his case, subjecting him to a prolonged period of nudity when he could not immediately produce a sample. Yet, RCI articulated cogent reasons for why it instituted the procedure as experienced by Whitman, supplying the "penological justification" necessary to defeat Whitman's constitutional claims. Specifically, RCI believed the strip search and nude collection reduced the opportunity for inmates to contaminate or substitute their urine samples and thwart RCI's attempts to maintain a drug-free facility. In crediting RCI's justification for its policy, we acknowledge that "[p]rison officials must be accorded wide-ranging deference in matters of internal order and security." *Meriwether*, 821 F.2d at 417; *see also Johnson*, 69 F.3d at 145 (noting that the animating theme of the Supreme

Court's prison jurisprudence is the requirement that judges respect hard choices made by prison administrators).[1]

Further, we note that Whitman's attestations that he felt humiliated, particularly by the twenty-minute period he remained naked until he could produce a sample, is unavailing considering that "a prisoner's expectation of privacy is extremely limited in light of the overriding need to maintain institutional order and security." *Meriwether*, 821 F.3d at 418 (citing *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)); *see also Calhoun*, 319 F.3d at 939 ("There is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation."). Being made to stand naked twenty minutes as part of a random drug-testing policy is not a "sufficiently serious" condition of confinement to rise to the level of a constitutional violation. Significantly, Whitman was regularly and repeatedly nude in front of prison staff during his twelve years of incarceration—while

---

[1] Whitman challenges RCI's practice of strip searching inmates prior to collection of the sample and its practice of requiring that the sample be provided in the nude because it appears to conflict with Wis. Stat. § 306.16, outlining under what circumstances a strip search may be conducted. Whitman also claims that RCI's practice may be inconsistent with the DOC's, and even RCI's own, written procedure regarding random drug testing. The district judge rightly concluded, though, that Whitman's argument is immaterial. Regardless of a plaintiff's insistence that a defendant failed to follow state law, the mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim. *See Snowden v. Hughes*, 321 U.S. 1, 11 (1944), *cited in Archie v. City of Racine*, 847 F.2d 1211, 1216-17 (7th Cir. 1988); *Pasiewicz v. Lake Co. Forest Pres. Dist.*, 270 F.3d 520, 526 (7th Cir. 2001) ("The federal government is not the enforcer of state laws.").

showering, during other strip searches—without complaint or apparent psychological damage, and Nesic did and said nothing to harass, humiliate, or intimidate Whitman during the incident in question.

Not only did Whitman fail to meet the objective prong of the Eighth Amendment inquiry, as his treatment on April 22, 1998 was not sufficiently serious to warrant possible liability, he has also failed under the subjective prong. Whitman provided no evidence tending to show Nesic or Ellerd intended to deliberately harm him, either through Nesic's administration of the strip and body-contents searches on April 22, 1998 or through Ellerd's possible implementation, maintenance, or approval of the practice followed by Nesic on April 22, 1998.[2] Whitman admits that Nesic did not touch, badger, ridicule, threaten, or intimidate him during the searches, or at any time before or after. In administering the test as he did, it is undisputed that Nesic followed RCI's procedure as he understood it and did not deviate from it in order to increase Whitman's embarrassment and discomfort. Whitman presented no evidence tending to show that Ellerd acted out of any motivation other than legitimate interest in the safety and security of the staff, prison populace, and community in maintaining the random drug-testing program as administered in this case.

---

[2] 42 U.S.C. § 1983 does not provide for respondeat superior liability. *Sanville*, 266 F.3d at 740. To prove Ellerd liable for a constitutional deprivation, he must be personally responsible for it, meaning, in this case, that the alleged strip search and nude sample collection occurred at his direction or with his knowledge and consent. *Id.* We assume, without specifically finding, as did the district court, that Whitman showed the requisite affirmative link between Ellerd, as director of security, and the conduct complained about as part of the random drug-testing program under Ellerd's purview.

Because we find no Eighth Amendment violation, we do not reach Nesic's and Ellerd's qualified immunity argument.

### III. Conclusion

For the foregoing reasons, the district court's decision is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*