In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 07-1384

REGGIE TOWNSEND,

*Plaintiff-Appellant,*

*v.*

LARRY FUCHS and JERRY ALLEN,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05 C 204—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED OCTOBER 25, 2007—DECIDED APRIL 10, 2008

_____

Before EASTERBROOK, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Wisconsin inmate Reggie Townsend filed a civil-rights action under 42 U.S.C. § 1983 against Larry Fuchs, Security Director at the New Lisbon Correctional Institution, and Sergeant Jerry Allen, a correctional officer in the segregation unit at the prison. Townsend, who was held at New Lisbon at all times pertinent to this appeal, claimed that Fuchs violated his Fourteenth Amendment right to due process by placing him, for 59 days, in administrative segregation—or, as it is known within the Wisconsin Department of Correc-

tions (WDOC), temporary lock-up (TLU). *See* Wis. Admin. Code DOC §§ 303.02(22), 303.11. Townsend also alleged that Allen deprived him of his Eighth Amendment right against cruel and unusual punishment by demonstrating deliberate indifference to the unsanitary conditions he endured while in TLU. Fuchs and Allen moved for summary judgment, but while their motion was pending, Townsend sought to amend his complaint to include New Lisbon Warden Catherine Farrey as a named defendant on both claims. The district court granted summary judgment for both Fuchs and Allen, and denied Townsend's motion to amend. We affirm the district court's grant of summary judgment for Fuchs and its denial of Townsend's motion to amend. However, we reverse the court's grant of summary judgment for Allen, and remand for further proceedings.

## I. History

Townsend's civil-rights action has a convoluted factual and procedural history; we will endeavor to simplify the underlying proceedings, while simultaneously drawing all reasonable factual inferences in Townsend's favor. *See Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007). We begin on November 11, 2004, when several members of the Latin Kings gang led a riot against correctional officers stationed in New Lisbon's Unit A. The gang members injured more than a dozen officers during the melee; one gang member, in particular, struck an officer in the jaw with a padlock that he placed in a sock and swung like a mace. In response, Warden Farrey placed New Lisbon in emergency status, suspended the prison's administrative rules, *see* Wis. Admin. Code DOC § 306.23(1), and instructed Security Director Fuchs to transfer inmates

believed to have participated in the riot to TLU and to investigate their involvement.

According to the WDOC administrative code, TLU is a "nonpunitive segregated status allowing an inmate to be removed from the general population pending further administrative action." *Id.* § 303.02(22). The "main purpose" of TLU is to detain an inmate temporarily "until it is possible to complete an investigation, cool down a volatile situation or hold a disciplinary hearing." *Id.* § 303.11 note. "The effort," the code continues, "is to avoid punitive segregation without a prior hearing, while assuring that inmates can be separated from the general population when there is good reason to do so." *Id.* For instance, prison officials may assign an inmate to TLU if the officials suspect that the inmate "may impede a pending investigation." *Id.* § 303.11(4)(a). And in keeping with the "temporary" aspect of the assignment, there is a limit on the amount of time that an inmate may spend in TLU: the initial period of placement may not last longer than 21 days, and may be extended to a maximum of 63 days. *See id.* § 303.11(3).

Approximately 150 inmates were assigned to TLU at one time or another while prison officials attempted to determine who participated in the November 11 prison riot. Townsend himself was placed in TLU on November 15, after officials received word that, during the riot, he had destroyed evidence that could have revealed the identities of some of the inmates who were involved. *See id.* § 303.11(1), (4)(a). Upon his transfer, Townsend received two WDOC notice forms that provided the reason why he was placed in TLU: one explained that "the offender may impede a pending investigation," and the other stated, "Pending Investigation of Staff Battery." Townsend acknowledged those reasons by signing the notice forms.

Townsend remained in TLU for 59 days while prison officials investigated his role in the prison riot, and on January 13, 2005, he was transferred back to New Lisbon's general population when the officials were unable to confirm that he had destroyed evidence regarding the riot.[1] In accordance with the WDOC administrative code, Townsend's parole eligibility was not affected by his TLU placement, nor was his sentence extended because of it. *See id.* § 303.11 note. Townsend did not receive a conduct report, or was otherwise disciplined.

That is not to say that Townsend's experience in TLU was entirely pleasant; the accommodations afforded to him during his stay were less than hospitable. The cells in TLU are designed to house only one inmate at a time: each cell is 12 feet by 6½ feet; contains one bunk, one sink, and one toilet; and is "wet," meaning that it features a shower that sprays onto the wall of the cell opposite the door and drains through the cell's floor. But because of the inordinately large number of inmates placed in TLU on suspicion of participating in the prison riot, Warden Farrey authorized, and Sergeant Allen helped supervise, the "double-bunking" of inmates in TLU cells. Consequently, Townsend was placed in a cell that was already occupied, where he shared the sink, toilet, and shower. He was, however, given his own "bunk"—a thin mattress that

---

[1]  The parties inexplicably agree that Townsend was assigned to TLU for 63 days. We say "inexplicably" because both sides also agree, and the record confirms, that Townsend was placed in TLU on Monday, November 15, 2004, and was transferred back to general population on Thursday, January 13, 2005. This period was 59 days, not 63. *See* http://www.timeanddate.com/date/duration.html.

was placed on the concrete floor adjacent to the shower, the only area in the cell where it would fit. We must assume, because the party resisting a motion for summary judgment receives the benefit of all reasonable inferences, *see Vinning-El*, 482 F.3d at 924, that the mattress became (in Townsend's words) "wet, moldy, and foul smelling" rather quickly. Townsend complained to numerous prison guards and officials about his unsanitary cell conditions and attempted to obtain a new mattress, to no avail. Thus, for the entire 59 days that Townsend was assigned to TLU, he slept on a wet and foul mattress.

In the weeks following his transfer back to New Lisbon's general population, Townsend filed several complaints with the prison's Inmate Complaint Examiner, challenging both his placement in TLU and the unsanitary conditions in his cell. After Townsend exhausted the administrative remedies available to him, *see* 42 U.S.C. § 1997e(a); Wis. Admin. Code DOC § 310.05; *Dixon v. Page*, 291 F.3d 485, 489-91 (7th Cir. 2002), he brought his § 1983 action against Security Director Fuchs and Sergeant Allen. Specifically, Townsend alleged that Fuchs violated his right to procedural due process as interpreted by the Supreme Court of the United States in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995), and *Wilkinson v. Austin*, 545 U.S. 209, 222-24 (2005). In *Sandin*, the Court explained that the Fourteenth Amendment provides to inmates a liberty interest in avoiding transfer to more restrictive prison conditions if those conditions result in an "atypical and significant hardship" when compared to "the ordinary incidents of prison life." 515 U.S. at 484-86. In such instances, the Court noted, the prison must afford the inmate procedural protections before the transfer occurs.

*See id.* at 487. Ten years later, the Court decided in *Wilkinson* that state inmates in Ohio had a liberty interest in avoiding placement in the state's Supermax prison, where inmates were held alone for 23 hours a day in cells that measured 7 feet by 14 feet. *See* 545 U.S. at 224. The Court concluded that those conditions constituted "an atypical and significant hardship under any plausible baseline" because assignment to the Supermax was indefinite and disqualified otherwise eligible inmates for parole consideration. *Id.* at 223-24. Townsend claimed that the conditions he endured while in TLU were sufficiently analogous to the conditions deemed atypically and significantly harsh in *Wilkinson*. For instance, he drew attention to the apparent similarities of the sizes of the TLU cells and Supermax cells; asserted that he, like the inmates incarcerated in the Supermax, was not allowed to have contact with friends, family, or even other inmates; and contended that he, unlike the inmates at the Supermax, was not allowed to leave his cell. Townsend therefore contended that he had a liberty interest in avoiding placement in TLU, and that Fuchs deprived him of his due-process rights by transferring him without first affording him a hearing.

Townsend also alleged that Sergeant Allen deprived him of his Eighth Amendment rights by demonstrating deliberate indifference to his basic need for clean and sanitary bedding. According to Townsend, Allen knew that he was forced to sleep on a wet and moldy mattress, and yet did nothing to remedy the unsanitary conditions. After discovery commenced, Townsend submitted an affidavit and provided deposition testimony, in which he explained his allegations against Allen in greater detail. Specifically, Townsend stated that while he was in TLU, he personally complained about his mattress to

Allen and requested a new, clean mattress for his cell. However, Townsend continued, Allen responded, "We can't get you a mattress right now," and denied his request without further explanation. Townsend further related that several prison guards later informed him that his request for a new mattress was denied because if he received the mattress, prison officials would have to provide a new mattress to everyone else in TLU. Townsend also stated that the unsanitary sleeping conditions caused him to suffer several severe ailments, such as respiratory problems, chest and stomach pains, and muscle aches.

Security Director Fuchs and Sergeant Allen disputed Townsend's allegations and moved for summary judgment. Fuchs argued, among other things, that Townsend's due-process claim was meritless because the conditions in TLU were not analogous to those conditions the Supreme Court deemed atypically and significantly harsh in *Wilkinson*. Allen, in turn, argued that Townsend's Eighth Amendment claim failed because he was not personally responsible for the unsanitary condition of Townsend's mattress. In support of his argument, Allen attested in an affidavit that Townsend never spoke with him regarding the condition of his mattress; as Allen put it, "[a]t no time" did Townsend complain to him "about unsanitary or wet condition[s] of his cell or mattress," nor did he "personally observe a problem concerning an unsanitary cell or wet mattress" in Townsend's cell or any other cell in TLU. But in several proposed findings of fact that Allen later filed with the district court, he admitted that Townsend had complained to him about the state of his mattress and had requested a new one; Allen further stated that he did not provide Townsend with a new mattress, even though New Lisbon had clean

mattresses available. Finally, Allen conceded that he understood that it is unhealthy to sleep on a wet and moldy mattress, and that people risk developing health problems if they are forced to sleep on such a mattress.

After briefing on the summary-judgment motion completed, Townsend sought leave to amend his complaint and add Warden Farrey as a defendant to both his due-process and Eighth Amendment claims. *See* Fed. R. Civ. P. 15(a). As Townsend alleged, Farrey visited the TLU unit during the time that he was assigned there and saw that, when inmates were double-celled, one inmate had to sleep on the cell floor. Townsend continued that Farrey was the "ultimate decision-maker" at New Lisbon during the 59 days he was confined in TLU, and accordingly was involved in denying him his due-process rights, and exhibited deliberate indifference to the unsanitary conditions he endured.

The district court granted Security Director Fuchs and Sergeant Allen's motion for summary judgment. The court first rejected Townsend's due-process claim against Fuchs on the ground that Townsend did not have a liberty interest in avoiding TLU placement. The court likewise concluded that Townsend's Eighth Amendment claim against Allen was meritless. Although the court assumed that "being forced to sleep on a wet and moldy mattress for [59] days is sufficiently serious" to establish an Eighth Amendment violation, the court determined that Townsend failed to proffer any evidence showing that Allen was deliberately indifferent to the unsanitary conditions. As the court explained, Townsend "proposed no facts to show that he complained about his mattress to defendant Allen, that he asked defendant Allen for a replacement because his mattress was wet or foul smell-

ing or that . . . Allen was aware of the level of deterioration in the condition of plaintiff's mattress."

Finally, the district court denied as futile Townsend's motion to amend. Because Townsend had no liberty interest in avoiding placement in TLU, the court determined that he had no viable due-process claim against Warden Farrey. Likewise, the court continued, any Eighth Amendment claim against Farrey would fail because Townsend proffered no evidence showing that she was personally responsible for the conditions in his cell. The court accordingly entered judgment for Security Director Fuchs and Sergeant Allen, and closed the case.

## II. ANALYSIS

On appeal, Townsend attacks the district court's grant of summary judgment for Security Director Fuchs and Sergeant Allen. Townsend also asserts that the court erred by denying his motion to amend his complaint. We will address these arguments in order, beginning with the district court's grant of summary judgment.

### A. The district court's grant of summary judgment

By bringing his § 1983 action against Security Director Fuchs and Sergeant Allen, Townsend shouldered the burden of establishing that the men deprived him of his constitutional rights under the Fourteenth and Eighth Amendments, respectively. *See Johnson v. Snyder*, 444 F.3d 579, 583-85 (7th Cir. 2006). Thus, to prevail on his argument that the district court erroneously granted summary judgment for Fuchs and Allen, Townsend must

show that the evidence he proffered created a "genuine issue as to any material fact" as to whether either man deprived him of his rights, and that they were not "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Vinning-El*, 482 F.3d at 924. Our review is *de novo*, *see Vinning-El*, 482 F.3d at 924, and we may affirm on any basis supported by the record, *see Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004); *see also Winters v. Fru-Con Inc.*, 498 F.3d 734, 743 (7th Cir. 2007).

### 1. *Townsend's Fourteenth Amendment claim against Security Director Fuchs*

We first address Townsend's argument that the district court erroneously granted summary judgment for Security Director Fuchs. Townsend essentially reasserts the argument that he made before district court. Specifically, he contends that Fuchs violated his due-process rights under *Sandin* and *Wilkinson* by placing him in TLU without procedural protections.

Because it is undisputed that Townsend was not afforded a hearing or other procedural protections before he was placed in TLU, his argument turns on whether he had a constitutionally protected liberty interest in avoiding placement in TLU. *See Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *Gillis v. Litscher*, 468 F.3d 488, 491-92 (7th Cir. 2006). The Constitution itself does not create an interest in avoiding transfer within a correctional facility. *See Wilkinson*, 545 U.S. at 222; *Meachum v. Fano*, 427 U.S. 215, 225 (1976). Nevertheless, in *Sandin* the Supreme Court determined that the Fourteenth Amendment provides to inmates a liberty interest in avoiding

placement in more restrictive conditions, such as segregation, when those conditions pose an atypical and significant hardship when compared to the ordinary incidents of prison life. *See* 515 U.S. at 484. However, since the Court decided *Sandin*, we have repeatedly determined that even extremely harsh prison conditions may not be so "atypical" as to create the liberty interest the Court contemplated. *See, e.g.*, *Lekas v. Briley*, 405 F.3d 602, 609 (7th Cir. 2005); *Thomas v. Ramos*, 130 F.3d 754, 760-62 (7th Cir. 1998); *Wagner v. Hanks*, 128 F.3d 1173, 1175-76 (7th Cir. 1997). To that end, we have concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes. *See Lekas*, 405 F.3d at 608-09 & 608 n.4 ("[R]eassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest."); *Crowder v. True*, 74 F.3d 812, 815 (7th Cir. 1996) (holding that placement of inmate in non-disciplinary segregation for three months did not create liberty interest). Indeed, there is nothing "atypical" about discretionary segregation; discretionary segregation is instead an "ordinary incident of prison life" that inmates should expect to experience during their time in prison. *See Lekas*, 405 F.3d at 608-09; *Wagner v. Hanks*, 128 F.3d 1173, 1176 (7th Cir. 1997) ("Even a prisoner who had committed a white-collar crime and had been assigned to the lowest-security prison in the state's system might find himself in segregation for a nondisciplinary reason."); *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir. 1987) ("Given the broad uses of administrative segregation . . . inmates should reasonably anticipate being confined in administrative segregation at some point in their incarceration.").

Here, it is clear that Townsend's assignment to TLU was discretionary. In fact, by admitting that his placement in TLU was contingent upon prison officials' continuing investigation into whether he destroyed evidence related to the prison riot, Townsend concedes that he was placed in TLU for discretionary reasons. *See* Wis. Admin. Code DOC § 303.11(1), (4)(a); *see also Lekas*, 405 F.3d at 608 & n.4; *Thomas*, 130 F.3d at 761. Townsend's concession comports with the WDOC's administrative scheme governing TLU placement. According to the administrative code, TLU is, by its very nature, discretionary; it is "a nonpunitive segregated status" that allows prison officials "to complete an investigation, cool down a volatile situation or hold a disciplinary hearing." *See* Wis. Admin. Code DOC §§ 303.02(22), 303.11 note; *cf. Russ v. Young*, 895 F.2d 1149, 1153-54 (7th Cir. 1989) (noting that TLU determinations are discretionary because they are "dependent only on the subjective decision of the security officers"). Moreover, the evidence submitted to the district court reflects that Townsend was assigned to TLU solely for discretionary reasons. Townsend received two WDOC notices explaining that he was being held in TLU for investigative reasons that he, in turn, acknowledged. Townsend was then transferred back to New Lisbon's general population as soon as he was cleared of any wrongdoing, and he never was disciplined in connection with his time in TLU. Simply put, it cannot be disputed that Townsend's time in TLU constituted discretionary segregation, in which he had no liberty interest avoiding. *See Lekas*, 405 F.3d at 608 & n.4; *Thomas*, 130 F.3d at 761.

Townsend continues, however, that although he was placed in TLU for discretionary reasons, the conditions he endured while in TLU were sufficiently harsh to trigger

the due-process protections announced in *Sandin*. Specifically, Townsend renews his contention that the conditions he faced in TLU—the double bunking, the sharing of the small wet cell and its amenities, and the limited human contact—were sufficiently analogous to the conditions of the state Supermax prison in *Wilkinson* to create a liberty interest in avoiding TLU.

Townsend misreads *Wilkinson*, and in so doing commits a mistake that renders inapt any comparison between the conditions in TLU and the conditions of the Supermax prison. As we noted in our recent decision *Gillis v. Litscher*, the Supreme Court in *Wilkinson* did not determine that the conditions in the Supermax prison created a liberty interest by themselves. *See Gillis*, 468 F.3d at 492. Although the Court briefly summarized the conditions that inmates faced in the Supermax, the Court based its holding largely on the fact that placement was indefinite and disqualified otherwise eligible inmates from consideration for parole. *See Wilkinson*, 545 U.S. at 223-24; *Gillis*, 468 F.3d at 492. Indeed, absent the indefinite placement and disqualification from parole, the Court stated that the conditions of confinement at the Supermax "likely would apply to most solitary confinement facilities," suggesting that the conditions themselves were ordinary incidents of prison life that inmates have no liberty interests in avoiding. *Wilkinson*, 545 U.S. at 224; *see also Westefer v. Snyder*, 422 F.3d 570, 587 (7th Cir. 2005). In short, the Court in *Wilkinson* did not delineate what specific harsh conditions give rise to a liberty interest. *See Wilkinson*, 545 U.S. at 224; *Gillis*, 468 F.3d at 492. And because Townsend's placement in TLU neither was indefinite, nor affected his parole eligibility, nothing in *Wilkinson* requires us to reconsider our established

position that inmates have no liberty interest in avoiding placement in discretionary segregation. *See Gillis*, 468 F.3d at 492; *see also Holly v. Woolfolk*, 415 F.3d 678, 680 (7th Cir. 2005) (citing *Wilkinson* to support proposition that "being placed in segregation is too trivial an incremental deprivation of a convicted prisoner's liberty to trigger the duty of due process"). The district court thus correctly granted summary judgment for Security Director Fuchs.

This is not to say that Townsend has no avenue to seek redress for the conditions he experienced while in TLU. We conclude only that the conditions have no bearing on whether New Lisbon prison officials were required to provide Townsend with procedural protections before placing him in TLU. The issue of the cell conditions in TLU is best analyzed as a claim brought under the Eighth Amendment, *cf. Gillis*, 468 F.3d at 492-95, which Townsend raised against Sergeant Allen, and to which we now turn.

## 2. *Townsend's Eighth Amendment claim against Sergeant Allen*

Townsend next challenges the district court's grant of summary judgment for Sergeant Allen. According to Townsend, he proffered evidence before the district court showing that Allen had actual knowledge that his health was jeopardized by sleeping on the wet and moldy mattress. That evidence, Townsend asserts, created a genuine issue of material fact as to whether Allen exhibited deliberate indifference to the unsanitary conditions in his cell.

The Supreme Court has interpreted the Eighth Amendment as requiring a minimum standard for the treatment of

inmates by prison officials: the prison conditions must not, among other things, involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). Accordingly, an inmate's constitutional challenge to prison conditions requires us to undertake a two-part examination. *See Whitman*, 368 F.3d at 934. First, we must determine whether the conditions at issue were "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted); *see also Gillis*, 468 F.3d at 493. If the inmate successfully establishes that the conditions were sufficiently serious, we then examine whether prison officials acted with "deliberate indifference" to the conditions in question. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference," in turn, means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it. *See Farmer*, 511 U.S. at 847; *see also Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995). As such, it is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk. *See Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference. *See Pierson*, 391 F.3d at 902; *Proffitt v. Ridgway*, 279 F.3d 503, 506 (7th Cir. 2002).

Based on the parties' dearth of input on the matter, it appears that they assume that Townsend endured a

prison condition sufficiently serious to constitute an Eighth Amendment violation. The parties' assumption might be incorrect if Townsend himself contributed to the mattress's foul state by, say, failing to place it on top of the bed while he or his cell-mate showered, and until the floor had dried. *See Freeman v. Berge*, 441 F.3d 543, 547 (7th Cir. 2006) (concluding that prisoner's starvation was self-inflicted when prison deprived meals because of his refusal to abide by prison's meal-time rules). However, Sergeant Allen forfeited the point on appeal by failing to raise it in his brief. *See Williams v. REP Corp.*, 302 F.3d 660, 666 (7th Cir. 2002). And even if Allen had raised the point, on this record we cannot say for certain that he would have prevailed. The party opposing summary judgment receives the benefit of reasonable inferences, *see Vinning-El*, 482 F.3d at 924, and it is possible that there was some reason why Townsend could not have placed his mattress on top of his cell-mate's bunk, so that both mattresses stayed dry. Indeed, at oral argument Townsend's attorney stated that Townsend attempted to move his mattress to keep it from getting wet when the shower was turned on, but to no avail. If Townsend was, in fact, unable to move his mattress to a dry area, then we would be hard-pressed to fault him and his cell-mate for refusing to abstain from bathing for his entire 59-day stint in TLU, just so Townsend could have had a dry place to sleep. *See Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("[A] state must provide . . . reasonably adequate ventilation, sanitation, bedding, [and] hygienic materials. . . .").

But that aside, we must assess the parties' shared assumption against the record as it is currently developed. And, in that light, the parties' assumption seems sound.

*See McCord v. Maggio*, 927 F.2d 844, 846-47 (5th Cir. 1991) (finding Eighth Amendment violation where inmates "were provided mattresses at night which were placed on the sometimes flooded floors of the cells . . . [where they] 'either had to stand up all night or sleep on a wet mattress on the floor' "). We have stated that a lack of sanitary conditions, including clean bedding, may qualify as a denial of the "minimal civilized measure of life's necessities." *Gillis*, 468 F.3d at 494; *see also McCord*, 927 F.2d at 846-47; *Maxwell v. Mason*, 668 F.2d 361, 363 (8th Cir. 1981) (stating confinement in isolation without adequate clothing or bedding supports Eighth Amendment claim); *Ramos*, 639 F.2d at 568.

We therefore turn our attention to whether Townsend proffered evidence establishing that Sergeant Allen was deliberately indifferent to the unsanitary conditions in his cell. The district court concluded that Townsend proffered no such evidence; as the court explained, Townsend "proposed no facts" showing that he complained about his mattress to Allen. But the district court did not properly characterize the evidence when reaching this conclusion, and, more importantly, did not view the evidence in a light most favorable to Townsend. *See Vinning-El*, 482 F.3d at 924. Specifically, Townsend submitted an affidavit and provided deposition testimony, in which he stated that he personally complained about his mattress to Allen and requested a new, clean mattress for his cell. Townsend further related that Allen denied his request without explanation, and that he later learned that his request was denied on the basis that if he received a mattress, everyone else in TLU would also have to receive one. Allen initially disputed Townsend's version of events in an affidavit of his own, and for a time during the sum-

mary-judgment proceedings, both men stood by their respective stories and asserted that their version of events—and only their version—was true. But then Allen's story wavered. Allen stated in proposed findings of fact that Townsend complained to him about the state of his mattress and requested a new one. Allen further admitted that he did not provide Townsend with a new mattress even though the prison had clean mattresses available, and that he also understood that an individual could develop health problems if he was forced to sleep on a wet and moldy mattress.

In other words, neither Townsend, nor Sergeant Allen, proffered evidence beyond their own testimony that either directly corroborated their respective stories, or completely refuted the competing version of events. Thus, the dispute over whether Allen knew about Townsend's cell conditions comes down to a good old-fashioned swearing contest that can be resolved only by assessing the credibility of the two men. Credibility determinations, however, lie exclusively within the fact-finder's domain and are not appropriate for a district court to make at the summary judgment stage, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001); *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000), particularly when the moving party's version of the facts changed over time to eventually support the non-moving party's position, *see Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir. 2001) ("Summary judgment is warranted *only if* 'there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law.'" (alteration in original) (emphasis added) (quoting Fed. R. Civ. P. 56(c)).

Therefore, when we view the record in the light most favorable to Townsend, we see a material dispute over whether Sergeant Allen knew that Townsend was forced to sleep on the wet and moldy mattress while he was in TLU. *See Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003) ("[W]e have warned before of falling for the trap of weighing conflicting evidence during a summary judgment proceeding."). And whether Allen knew about the substantial risk of serious harm created by the unsanitary cell conditions speaks directly to whether he exhibited deliberate indifference to Townsend's plight. *See Pierson*, 391 F.3d at 902; *Proffitt*, 279 F.3d at 506. The district court accordingly was wrong to grant summary judgment for Allen.

### B.   *The district court's denial of Townsend's motion to amend*

Finally, Townsend argues that the district court erred by denying his motion to amend his complaint and name Warden Farrey as a defendant. The district court concluded that such an amendment would be futile because Townsend's proposed claims against Farrey would not survive summary judgment. *See King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007); *Sound of Music Co. v. Minn. Mining & Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007). That decision was one left to the district court's discretion, *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005), which, we cannot say, the court abused. It would, indeed, be futile for Townsend to include Warden Farrey as a defendant on his due-process claim; as explained earlier, Townsend had no liberty interest in avoiding placement in TLU, and thus his claim would fail regardless of whom he named as a defendant. *See King*, 496 F.3d at 819; *see also Lekas*, 405 F.3d

at 607. And Townsend failed to establish that Farrey had direct control over the unsanitary conditions in TLU. The most that Townsend asserts is that Farrey should have known about the conditions in his cell because, as the "ultimate decision-maker" at New Lisbon, she knew that inmates were double-celled in TLU and had to sleep on the floor. But because Townsend points to no evidence showing that Farrey either observed Townsend's cell personally or was informed of his specific situation, he would be unable show that she acted with deliberate indifference by failing to remedy the conditions in his cell. *See Galdikas v. Fagan*, 342 F.3d 684, 693 (7th Cir. 2003) ("'An individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation.'" (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983))); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *see also Farmer*, 511 U.S. at 837. Thus, the district court correctly concluded that it would be futile to add Farrey as a defendant to Townsend's Eighth Amendment claim, *see King*, 496 F.3d at 819, and was right to deny his motion to amend.

### III. CONCLUSION

To recap, we AFFIRM both the district court's grant of summary judgment for Security Director Fuchs and its denial of Townsend's motion to amend. However, we REVERSE the court's grant of summary judgment for Sergeant Allen, and REMAND for further proceedings.