**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 11, 2011[*]
Decided May 19, 2011

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

JOHN L. COFFEY, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

No. 10-1127

| | |
|---|---|
| JAMES E. MILLER, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of Illinois. |
| | |
| *v.* | No. 07-CV-154-DRH |
| | |
| ROBERT J. HERTZ and JOSEPH | David R. Herndon, |
| GULASH, | *Chief Judge*. |
| *Defendants-Appellees*. | |

**O R D E R**

James Miller seeks damages under 42 U.S.C. § 1983 claiming that, while he was awaiting trial in Madison County, Illinois, on two counts of murder, the sheriff and superintendent of the jail violated his right to due process by confining him in segregation on "suicide watch" for over two years. On appeal he challenges the grant of summary judgment for the two defendants. We uphold that decision.

---

[*] After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

Except as noted, the following facts are undisputed. Miller was first placed on suicide watch on August 5, 2003. After learning from his attorney that he might face the death penalty, Miller tore fabric from his mattress, braided it into a rope, used some of that rope to tie shut the door to his cell, and used the rest to try to hang himself. Guards broke in and rescued Miller, and later that day Dr. Kenneth Gilbert, a psychiatrist, interviewed him and recommended "standard suicide precautions," including segregation and observation by staff every 15 minutes. Dr. Gilbert noted that Miller previously had been prescribed medication for depression, and he diagnosed Miller as having severe post-traumatic stress disorder and depression. He could not be certain, however, whether Miller's attempt was "depression related or a 'rational suicide' based on assessment of his probable prison term." Under the direction of defendant Joseph Gulash, the jail superintendent, Miller was moved to a different segregation unit (he was in segregation already, after stabbing another prisoner with a pencil), put on a 15-minute watch, and stripped of his clothing, mattress, and personal property. (He was given clothing after 3 to 4 days.) Miller later acknowledged that these precautions had indeed been necessary to prevent him from killing himself.

During the following month, medical staff disagreed about the scope of the precautions necessary to safeguard Miller. Five days after Miller's suicide attempt, a social worker interviewed him and concluded that he no longer was suicidal. She recommended to Gulash that the suicide watch be ended and that Miller be allowed a mattress or sleeping bag (though nothing more). But Dr. Daniel Cuneo, a psychologist, formed a different opinion after evaluating Miller eleven days later at the direction of the judge presiding over his state criminal case. Dr. Cuneo concluded that Miller was competent to stand trial but still presented a high risk of suicide and should be "continued on suicide precautions." Miller had been hearing voices, Dr. Cuneo reported, and appeared extremely depressed. He had a history of numerous suicide attempts, some of them manipulative. For example, the doctor wrote, Miller had declared a hunger strike immediately after his recent attempt. Dr. Cuneo noted that in the past Miller had refused to take prescribed medications. Miller also exhibited an "extremely low frustration tolerance level" and currently was experiencing extreme stress.

The suicide watch continued, and near the end of the first month, Gulash issued a memorandum to jail personnel clarifying what Miller was allowed to have in his cell. The precautions would continue, Gulash said, but Miller would be given two sleeping bags specially designed for suicidal inmates, a set of clothing, and permission to read newspapers and his mail whenever his social worker or attorney visited. (According to Miller, Gulash had been reluctant to give Miller access to his mail because of concern that he would use it to fashion a weapon.)

Dr. Gilbert continued to monitor Miller. After a meeting in November 2003, he

documented that Miller was unstable and still contemplating suicide. Miller described having two personalities, one weak and unable to cope and the other strong and invulnerable. The doctor recommended that Miller be moved to a psychiatric hospital instead of remaining at the jail in isolation, but there is no evidence that he followed up on this advice or that Miller and his defense team supported the proposal. Dr. Gilbert met with Miller again in January 2004. Afterward he documented that Miller had refused his medications three times during December. But otherwise, Dr. Gilbert noted, Miller had followed his medication regime and was not experiencing suicidal thoughts. The doctor expressed concern that Miller's prolonged isolation had precipitated a "significant reduction of function" but did not elaborate. Dr. Gilbert concluded that Miller should remain in segregation though it was time to reconsider the continuing restrictions. He added that Miller had acknowledged that a return to suicide watch would be necessary if he refused to take his medications.

Dr. Gilbert's view did not prevail, and Miller's defense team requested the opinion of psychologist Michael Armour, who interviewed Miller in January. Miller told Dr. Armour that he had attempted suicide four or five times since 2002 and had not been taking his medications before the August attempt. Dr. Armour concluded that Miller posed a security concern because of his impulsiveness and history of trying to harm himself. Further, because of Miller's low tolerance for frustration, Dr. Armour cautioned against housing Miller with more than a few other prisoners. He suggested moving Miller to a cell by himself or with one other prisoner but with fewer restrictions than he faced in his current isolation. Dr. Armour acknowledged, however, that any change for Miller depended on him continuing to take his prescribed medications. He did not say whether he knew that Miller had refused those medications several times recently. Miller's defense team forwarded Dr. Armour's recommendation to defendant Robert Hertz, the sheriff, and asked him to move Miller out of his restrictive confinement. Hertz forwarded the letter to his chief deputy, but there is no evidence the deputy responded to Miller.

After Dr. Armour's evaluation, Dr. Gilbert met with Miller at least three more times. Within three weeks of Dr. Armour emphasizing that any relaxation in Miller's restrictive confinement must be conditioned on his continued use of prescribed medications, Miller told Dr. Gilbert that "Jay," the stronger of his dual personalities, had directed him to stop taking the drugs. Dr. Gilbert opined that Miller was approaching sensory deprivation and needed a stimulus such as mail or a newspaper. The doctor prescribed additional medications and noted that Miller—though cooperative during the meeting—had punched the guard who escorted him back to his cell. Dr. Gilbert interviewed Miller on two more occasions in April 2004, concluded that he was no longer suicidal, and recommended moving him to the special housing unit.

In early April 2004, Gulash wrote to the chief deputy about Miller's situation. He recounted Miller's history: the stabbing of another prisoner, his attempted suicide, the placement on suicide watch, and the recommendation from Dr. Cuneo, a court-appointed psychologist, that suicide precautions continue. Gulash also acknowledged that Dr. Gilbert had proposed moving Miller out of isolation to a psychiatric hospital and that a concerned nurse had advocated giving Miller a mattress. Gulash suggested asking Dr. Cuneo to reevaluate Miller. Gulash's report was forwarded to the state attorney's office, which responded by telling him to "follow the suicide watch protocol" that was in place. If Miller's conditions needed to change, Gulash was informed, his lawyers could seek the trial judge's intervention. Gulash also memorialized an April 2004 conversation with a supervisor at the Office of Jail and Detention Standards at the Illinois Department of Corrections. Gulash related that Miller had made threats, attempted suicide, and smeared feces on the window of his cell door to hide his activities, and the supervisor then authorized limiting Miller to one shower per week.

In July 2004, Gulash met with Dr. Cuneo and the nurse who was mentioned in his report to the chief deputy. Gulash noted that Miller had not always been taking his medications. As recorded by Gulash, the nurse said that Miller had told her he was willing to remain in his current cell if he could have a mattress. When Dr. Cuneo opined that allowing a mattress "would not jeopardize the situation," Gulash gave approval.

In September 2004, Miller complained to the Office of Jail and Detention Standards that he had been on suicide watch too long and was not being allowed to shower. A month later the manager of that office wrote back that a specialist had investigated Miller's complaint but uncovered no violations of jail standards. He noted that Dr. Cuneo was being consulted about the need for ongoing suicide precautions and disclosed that prison administrators were keeping a log of Miller's showers. The manager copied this response to Sheriff Hertz. After this complaint, six months passed before Miller filed his next formal request in April 2005. His defense team asked Gulash to allow legal materials in his cell, which Gulash approved.

In June 2005, Dr. Cuneo evaluated Miller a final time—again at the direction of the presiding judge—to report on his fitness to stand trial, his suicide risk, and his housing needs at the jail. Dr. Cuneo reviewed Miller's medical file and Dr. Armour's report, spoke with prison staff, and interviewed Miller. His report describes Miller as fit to stand trial but still in need of suicide precautions. Although Miller was not "imminently suicidal," Dr. Cuneo observed, he continued to be at high risk because of his impulsive nature, stressful situation, and frequent refusal to take prescribed medications. Miller had repeatedly threatened staff, Dr. Cuneo noted. In December 2004, for example, Miller had threatened to hit a guard, and in March 2005 he had said he would "do something stupid" if

he did not get to court soon. Dr. Cuneo reported that he discussed with Miller the prospect of moving to the special housing unit, but Miller did not want to be housed with "the nuts" and insisted on being placed in the general population, which Dr. Cuneo did not recommend.

After being convicted of murder and sentenced to life in prison, Miller was moved into state custody. He then sued Hertz and Gulash, claiming that the conditions of his segregation violated his right to due process. He alleged that during his two years on suicide watch he was deprived of a mattress for a year (which, he says, caused a back injury), went months without a shower, was not permitted to send mail except through his attorney, could not leave his cell for recreation, was denied cleaning supplies, and could not buy hygiene products at the commissary. Miller asked on three occasions that counsel be recruited to assist him, but a magistrate judge declined each request.

The two defendants moved for summary judgment on the ground that they had, at all times, relied on the advice of medical professionals. They also pointed out that during his deposition Miller had contradicted many of his allegations and confirmed that, while he was on suicide watch, prison staff let him visit the nurse and the infirmary, regularly cleaned his cell (since it would have been dangerous to allow a suicidal inmate access to cleaning products), and permitted him to have commissary items and legal materials.

In granting summary judgment for Hertz and Gulash, the district court noted that the several professionals consulted by the defendants had given conflicting opinions about the degree of risk that Miller again would attempt suicide. Therefore, the court reasoned, the defendants could not be held liable for accepting Dr. Cuneo's advice and keeping Miller on suicide watch. Miller challenges this conclusion on appeal.

As a pretrial detainee, Miller was entitled to no less protection against deliberate indifference than convicted inmates. *See Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *Guzman v. Sheahan*, 495 F.3d 852, 856-57 (7th Cir. 2007). To overcome summary judgment, Miller was required to show that Hertz and Gulash knew that keeping him on suicide watch presented a substantial risk of serious harm, and yet intentionally disregarded that risk. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008).

Miller argues that the defendants' conduct rose to that level when they followed Dr. Cuneo's advice over that of Dr. Gilbert and Dr. Armour. But a "difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). So without evidence that Dr. Cuneo's opinion

represented a substantial departure from accepted professional standards, *see Norfleet*, 439 F.3d at 396, we cannot conclude that Hertz and Gulash intentionally disregarded a substantial risk to Miller by adhering to Dr. Cuneo's recommendations. This is especially true given that both Dr. Gilbert and Dr. Armour offered recommendations specifically conditioned upon Miller consistently taking his prescribed medications, which the defendants believed, and Miller later admitted, he was not doing. Moreover, neither of these doctors recommended that Miller be placed in the general population, which is the only alternative he expressed a willingness to accept.

Miller also contests the magistrate judge's denial of his three requests that counsel be recruited to represent him. This lawsuit, he argues, was too complex for him to fairly litigate with only the assistance of fellow inmates. When faced with a request to recruit counsel, a district court must consider, among other things, the complexity of a plaintiff's claims and his ability to litigate his case. *See Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007) (en banc). The judge here did not abuse his discretion in denying Miller's requests. The judge noted that the issues in Miller's case were not so complex that he needed counsel and, moreover, that Miller's pleadings had "all been more than adequate," so the judge did not believe that an attorney would have advanced the case more successfully. The court's analysis meets the standard set forth in *Pruitt*. *See Romanelli v. Suliene*, 615 F.3d 847, 852-53 (7th Cir. 2010); *Jackson v. Kotter*, 541 F.3d 688, 700 (7th Cir. 2008).

AFFIRMED.